# EXHIBIT A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

QUINCEY ROBINSON, individually and on behalf of all others similarly situated,

Case No. **14CH14861**

Plaintiff,

v.

AVANQUEST NORTH AMERICA INC., a California corporation, and AVANQUEST SOFTWARE S.A., a French company,

Defendants.


FILED
CH-
SEP 15 2014
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Quincey Robinson brings this Class Action Complaint and Demand for Jury Trial against Defendants Avanquest North America Inc. and Avanquest Software S.A. (collectively referred to in the singular as "Avanquest") seeking relief for injuries they caused to him and a putative class of individuals through their deceptive design, marketing, and sale of their Fix-It Utilities Professional software ("Fix-It Utilities"). Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE ACTION

1.      Defendant Avanquest Software S.A., through its subsidiary Avanquest North America Inc., develops software that it claims will increase the speed, performance, and stability of a personal computer ("PC"), protect against privacy risks, remove harmful errors, and improve Internet speeds. Unfortunately, as described more fully below, Avanquest deceptively markets Fix-It Utilities, which ultimately fails to deliver the level of utility advertised.

2.      Fix-It Utilities is available for purchase on Avanquest's websites, through third-

party resellers, and in packaged form at brick-and-mortar stores such as Best Buy and Office Depot. Marketing materials on Avanquest's websites, as well as on the software's physical packaging, say that Fix-It Utilities detects and repairs a wide range of PC errors, privacy threats, viruses, and other computer problems. Avanquest also promises that Fix-It Utilities will increase system startup speeds, prevent crashes and freezes, optimize a PC's performance, and remove security risks.

3. Contrary to these marketing materials (and reports generated by the software's computer scan), Fix-It Utilities isn't actually capable of *performing a credible diagnostic test* of a PC and cannot actually remove damaging PC errors, appreciably improve a computer's boot time, nor prevent the common causes of system freezes as promised. In reality, Avanquest intentionally designed Fix-It Utilities to invariably report that harmful errors and threats exist on a computer, regardless of its actual condition.

4. Avanquest holds itself out as a reputable leader in the "utility software" industry—*i.e.*, software that enhances and or repairs a PC's functionality. Because average consumers lack the requisite technical expertise to understand the underlying operations of Avanquest's software, they trust the company to convey truthful information about its products, and for its technology to honestly and accurately identify and remove harmful errors from their PCs. Avanquest betrayed that trust, and as a result, thousands of consumers have been, and continue to be, tricked into buying its software.

## PARTIES

5. Plaintiff Quincey Robinson is a natural person and resident of the State of Illinois.

6. Defendant Avanquest North America Inc. is a corporation existing under the laws of the State of California, with its headquarters and principal place of business located at 23801

Calabasas Road, Suite 2005, Calabasas, California 91302. Defendant Avanquest North America Inc. is a subsidiary of Defendant Avanquest Software S.A. Defendant Avanquest North America Inc. conducts business throughout this County, the State of Illinois, and the United States.

7.     Defendant Avanquest Software S.A. is a French company with its headquarters and principal place of business located at 91 Boulevard National, Immeuble Vision La Defense, 92250 La Garenne Colombes, France. Defendant Avanquest Software S.A. conducts business throughout this County, the State of Illinois, and the United States.

## JURISDICTION AND VENUE

8.     This Court has personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209(a) because Defendants conduct business transactions in Illinois and have committed tortious acts that took place in Illinois. Additionally, this Court has personal jurisdiction over Plaintiff Robinson because he is a resident of Illinois.

9.     Venue is proper in Cook County because Defendants conduct business transactions in Cook County, Plaintiff Robinson resides in Cook County, and the causes of action arose, in substantial part, in Cook County. Specifically, Plaintiff Robinson purchased Fix-It Utilities in Cook County.

## FACTUAL BACKGROUND

### I.     A Brief Overview of Avanquest.

10.     Defendant Avanquest Software S.A. is a multi-national company that boasts being "one of the top 10 consumer software publishers in the world".[1] According to Avanquest, the company's mission is to design software to "provide a more secure and enjoyable experience to

---

[1]     Avanquest's Corporate Profile, http://www.avanquest.com/USA/discover-avanquest/ (last visited Sept. 9, 2014).

people looking for easy and affordable software solutions in everyday life."[2]

11.     Avanquest Software S.A. sells its software products—including Fix-It Utilities—to consumers in the United States through its subsidiary, Avanquest North America Inc. Fix-It Utilities is Avanquest's "No. 1 Selling Disk Utility Software", which it claims is a "comprehensive tool to fix PC problems".

## II.     Avanquest Tricks Consumers Into Purchasing Fix-It Utilities by Uniformly Misrepresenting its Functional Capabilities.

12.     A consumer searching the World Wide Web for software to repair a damaged computer, protect against privacy threats, or generally increase the speed or performance of a PC will likely encounter advertisements for Fix-It Utilities. Clicking on one of Avanquest's advertisements directs the user to its website, www.avanquest.com, where Avanquest makes numerous representations regarding the software's utility.

13.     For example, a visitor to Avanquest's website is presented with the following descriptions of Fix-It Utilities' functional capabilities: [3]

- "One-Click runs comprehensive diagnostic tests, fixes PC problems in a flash and leaves your computer running like new";

- "With Fix-It's One-Click wizards and Active Intelligence Technology, you can fix everything easily and automatically . . . .";

- "Fixes your PC Today and Prevents Problems Tomorrow!";

- "Total Virus & Spyware Protection";

- "400% faster windows registry repair";

---

[2]     Avanquest's Mission and Values, http://www.avanquest.com/USA/group/company/ (last visited Sept. 9, 2014).

[3]     Avanquest's Fix-It Utilities 15 Professional, http://www.avanquest.com/USA/software/www.avanquest.com/USA/software/fix-it-utilities15-professional-501513 (last visited Aug. 31, 2014).

- "Stop PC Crashes & Freezes"; and

- "Repair System & Hard Drive Errors".

14.    Likewise, Fix-It Utilities' retail packaging lists the following representations about the software's functionality:

- "Fix, Speed Up and Maintain Your PC";

- "Keep[] your PC running like new";

- "Intelligently identif[y] system slowdowns";

- "Fix[] problems and speed[] up Windows";

- "Diagnose[] & update[] device drivers"; and

- "Stop[] PC crashes and freezes".

15.    But these representations do not accurately reflect Fix-It Utilities' true capabilities. The truth is that, irrespective of its "anti-virus" feature,[4] Fix-It Utilities primarily performs only two main functions: it is a registry cleaner[5] and it removes superfluous "temporary" files from a hard drive. These operations do not come close to squaring with Avanquest's representations about the software's functionality. For instance, as discussed more fully below, neither of these tasks remove damaging PC errors, appreciably improve a computer's boot time, or prevent the common causes of system freezes.

16.    Because of the impression created by Avanquest's affirmations of fact about the software's utility, consumers rightfully believe that Fix-It Utilities will detect the errors and

---

[4]    Avanquest also claims that Fix-It Utilities provides "Total Virus & Spyware Protection", but because this feature isn't installed on every user's computer, it is not central to this lawsuit.

[5]    "Registry cleaner" software is a type of utility program designed to remove unwanted or redundant items from the Microsoft Windows operating system registry. The "registry" is a database of configuration settings that help facilitate the operation of computer applications in the operating system.

problems identified above. To validate this belief, Avanquest designed Fix-It Utilities to appear

as though it's performing actual analyses of the health and security of a consumer's PC.

Unfortunately for purchasers of the software, and as discussed more fully below, that's not

actually the case.

**III.     Fix-It Utilities Was Designed to Invariably Report that a Computer Needs Repair Without Conducting a Credible Evaluation of its Condition.**

17.     Upon purchasing, installing, and running Fix-It Utilities for the first time, a screen

is displayed indicating to the user that the computer "is not optimized." *See* <u>Figure 1</u> below

(showing a screenshot of Fix-It Utilities' initial graphical user interface).



(<u>Fig. 1.</u>)

18.     After warning that the computer isn't optimized, Fix-It Utilities advises

conducting a diagnostic scan by clicking the "Analyze Now" button. <u>Figure 2</u> on the following

page shows a screenshot of Fix-It Utilities' scanning process purportedly assessing a computer's

condition.



**(Fig. 2.)**

19.    After the scan is complete, Fix-It Utilities displays an ominous graphical

depiction of an alert sign showing that a number of serious "problems" have been detected on the

computer, all of which require fixing. *See* Figure 3 below (showing a screenshot of Fix-It

Utilities' error reporting interface). In addition to this warning, Fix-It Utilities displays a graphic

of three cylinders labeled "Optimization", "Security", and "Maintenance", with color spectrums

ranging from red to green, along with corresponding percentages supposedly representing the

computer's condition based on the results of the software's diagnostics scan. *See id.*

**(Fig. 3.)**

20.     Clicking on the "Problems" section of Fix-It Utilities' navigation bar displays a

warning that "[x amount of] problem(s) are affecting [their] PC's health and security"

accompanied by an itemized list of problems that it claims are harming the computer. *See* <u>Figure</u>

<u>4</u> below.



**(Fig. 4.)**

21.     While the software's graphics and text appear alarming to the user, the truth is

that Avanquest designed Fix-It Utilities to report that a computer is in poor condition *without any*

*real evaluation.* In this way, the user believes that Fix-It Utilities is actually detecting and

reporting harmful errors—errors that presumably cause the problems that Avanquest represents

that the software will fix.

**IV.     Fix-It Utilities Was Designed to Invariably Report Benign Errors as Harmful.**

22.     On the surface it appears that Fix-It Utilities actually detects, reports, and repairs

errors that threaten the operations of a PC. In reality, Avanquest intentionally designed the

software to vastly overstate both the amount and severity of errors that it purportedly fixes in an

8

effort to persuade users that it functions as advertised—*i.e.*, that it actually detects and removes credible threats and PC problems.

23.     A closer look at the technology used in Fix-It Utilities' scanning engine reveals that the software always reports that a PC is in poor condition—regardless of its actual status or variances in the type of computer the software is running on—and misleadingly characterizes harmless files as severe "problems". Similarly, the software artificially inflates the number of issues detected, which causes Fix-It Utilities to invariably report that the computer is threatened by "problems" that require fixing.

24.     By way of illustration, each of the screenshots above (showing Fix-It Utilities detecting a number of issues and reporting them as "problems") result from scans conducted on a *brand new computer*. It logically follows from this finding that according to Fix-It Utilities' reporting algorithm, even brand new computers are threatened by "problems" requiring repair.

25.     Not only is Fix-It Utilities designed to artificially inflate the number of problems reported, the issues detected do not actually negatively impact a computer's operation. For instance, in Figure 3 above, Fix-It Utilities reported the computer's "Optimization" and "Maintenance" levels as poor. However, an inspection of the individual "problems" reported by Fix-It Utilities as causing the computer's "Optimization" and "Maintenance" levels to be poor shows that in actuality and as explained below, certain of these items are actually harmless registry keys and data files.

26.     Contrary to Fix-It Utilities' report, empty or not commonly used registry keys are benign items that don't, *ipso facto*, impede or adversely affect the normal operations of a computer. Accordingly, Fix-It Utilities' claim that these items are "problems" affecting the computer's condition is merely a tactic used to drive up the total number of problems reported to

9

the user.

27.    Fix-It Utilities also identifies and reports common files—called cookies[6]—as "threats" that require removal. This claim is also unsubstantiated. Microsoft, one of the largest developers of computer software and the creator of the Windows operating system, maintains a "Safety & Security Center" website that provides educational materials about PC security best practices. On its website Microsoft states that "[w]hile it is possible to misuse a cookie in cases where there is personal data in it, *cookies by themselves are not malicious*."[7]

28.    Cookies are ubiquitous on the web and are used by most popular websites. To illustrate the point, even Avanquest itself uses cookies. When a consumer visits one of its websites, Avanquest attempts to place a cookie onto the visitor's computer. Avanquest relies on cookies to, among other things, track information about visitors to its websites, such as which products they have added to their "shopping carts".[8] Avanquest even recognizes on its website that cookies aren't inherently bad.[9]

29.    This makes it all the more concerning that Avanquest designed Fix-It Utilities to detect its own cookies and report them as "threats" to a computer's security. For instance, Figure 5 on the following page shows Fix-It Utilities warning about the detection of a threat that has been quarantined.

---

[6]    "Cookies" are small computer files that are generated by websites and stored on the website visitor's computer. Websites use cookies to store useful information, such as usernames and preferences, to make interaction with the sites easier and more efficient.

[7]    Microsoft Safety & Security Center: What is a cookie?, http://www.microsoft.com/security/resources/cookie-whatis.aspx (last visited Aug. 29, 2014).

[8]    Avanquest: Shop With Confidence > Guaranteed Security, http://www.avanquest.com/USA/aq-you/shop-with-confidence/ (last visited Aug. 29, 2014).

[9]    *See id.*



(**Fig. 5.**)

30.     Further review of the purported "threat" shows that it's nothing more than an ordinary cookie. Moreover, the cookie that was detected and reported as a "threat" was generated by visiting *Avanquest's own website*. From this finding, it's apparent that rather than program Fix-It Utilities to legitimately evaluate the security risk posed by individual cookies, Avanquest engineered the software to classify commonplace cookies as "threats".

31.     The reason that identifying the above mentioned files as problems or threats is misleading is because Fix-It Utilities will virtually *always* report that certain files—files not actually detrimental to a PC's performance—are impacting the computer's condition. Compounding the problem is that these files occur and recur naturally with normal computer usage; therefore it is nearly certain that Fix-It Utilities will continue to find them as the software is used.

32.     Through the deceptive scheme described herein, Avanquest has profited, and continues to profit, by misleading consumers into believing that their PCs are damaged and/or at risk, and that the purchase and continued use of its Fix-It Utilities software is necessary to "fix"

these problems. But, because the software does not actually provide the benefits advertised, Avanquest does not deliver on its promises to users

## V.  Avanquest Continues its Deceptive Practices in Disregard of the Changing Utility Software Industry.

33.     Unfortunately for consumers, Avanquest is not alone in its use of the sorts of deceptive programmatic design and marketing practices at issue in this case. Rather, the utility software industry has been fraught with these tactics for over a decade. It is only recently, however, that software developers—like Avanquest and its competitors—have been called to account for profiting off of unsuspecting consumers.

34.     Indeed, numerous lawsuits have been filed against well-known competitors of Avanquest (*e.g.*, Symantec Corp. and AVG Technologies)—including several by Plaintiff's counsel here—which allege similar claims related to the deceptive design and marketing of utility software products. Several of those cases have resulted in classwide settlements and industry-changing modifications to the software products at issue—making their detection, reporting and repairing mechanisms far more transparent and more accurate when it comes to informing consumers of the threats posed by existing errors on their computers. Still others are being actively litigated. Rather than make the necessary changes to its software so that it *actually* detects, reports and repairs harmful problems and threats on users' PCs, Avanquest has continued its unlawful business practices and profits from them to this day.

## VI.   Plaintiff Robinson's Experience.

35.     In late 2013, Plaintiff Robinson visited his local office supply store to search for software that would increase the speed, performance, and stability of his PC, protect against privacy risks, remove harmful errors, and improve his Internet speeds. At the store, Plaintiff discovered Avanquest's Fix-It Utilities 14 Professional and read Avanquest's representations

about the software's utility located on its box and packaging materials, such as those described in

Paragraph 14 above and as depicted in Figure 6 below (showing a screenshot of Avanquest's

Fix-It Utilities product packaging).



(**Fig. 6.**)

36.     Relying upon the packaging's representations—including its assertion that the

product will "Fix, Speed Up and Maintain [his] PC", "Keep[ his] PC running like new",

Intelligently Identif[y] system slowdowns", "Fix[] problems and speed[] up Windows", and

"Stop[] PC crashes and freezes"—Robinson purchased Avanquest's Fix-It Utilities 14

Professional for approximately $39.95.

37.     The Fix-It Utilities software that Robinson purchased did not—and could not—

perform as advertised by Avanquest. In reality, Avanquest designed the software to invariably

and arbitrarily report that problems and threats exist on a user's computer, as detailed in Section

IV above. As such, Plaintiff purchased the product under the falsely created belief that Fix-It

Utilities was capable of honestly and accurately assessing the condition of his computer and that

it was otherwise capable of detecting and removing harmful problems and threats as promised.

38.     But for Avanquest's descriptions about Fix-It Utilities' functional capabilities,

Plaintiff would not have purchased and continued to use the software.

## CLASS ALLEGATIONS

39.     **Class Definition**: Plaintiff Robinson brings this action pursuant to 735 ILCS 5/2-801 on behalf of himself and a class of similarly situated individuals, defined as follows:

> All residents of the State of Illinois who purchased Avanquest's Fix-It Utilities Professional software.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, and (5) the legal representatives, successors, or assigns of any such excluded person.

40.     **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but on information and belief, Avanquest has sold its software to thousands of Class members throughout the State of Illinois, making joinder of each individual member impracticable. Ultimately, the Class members will be easily identified through Avanquest's records.

41.     **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members:

        a)     whether Avanquest intentionally designed Fix-It Utilities to invariably report that harmful problems and threats exist on a user's computer, regardless of the computer's actual condition;

        b)     whether Avanquest intentionally misrepresented the functionality of Fix-It

14

Utilities;

c) whether Avanquest's conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

d) whether Avanquest's conduct described herein constitutes fraudulent inducement;

e) whether Avanquest's conduct described herein constitutes a breach of contract; and

f) whether Avanquest has been unjustly enriched as a result of its conduct described herein.

42. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Avanquest has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

43. **Appropriateness**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Avanquest's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class

15

to obtain effective relief from Avanquest's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act**
**815 ILCS 505/1, *et seq.***
**(On Behalf of Plaintiff and the Class)**

44.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

45.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act"), protects both consumers and companies by promoting fair competition in commercial markets for goods and services.

46.     The Consumer Fraud Act prohibits any unlawful, unfair or fraudulent business acts or practices, including the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact.

47.     As described herein, Avanquest has engaged in deceptive and fraudulent business practices, as defined by the Consumer Fraud Act, by, *inter alia*: (i) misrepresenting Fix-It Utilities' functional capabilities as described in Section II, including Avanquest's descriptions in Paragraphs 13–14 and depicted in Figure 6; (ii) misrepresenting the results of the diagnostic scans (*i.e.*, the overall condition of users' computers) through in-software representations; (iii) using the misrepresentations to induce consumers into continuing to use the software; and (iv) selling software that lacks the advertised utility, produced false error reports, and was otherwise

16

incapable of functioning as Avanquest represented it would.

48. Specifically, Avanquest affirmatively represented to Plaintiff and the Class that Fix-It Utilities would honestly and accurately scan their PCs for harmful problems, increase their PCs' speed and stability, increase the speed of their Internet connection, and protect their PCs from harmful programs.

49. The above affirmative representations, as well as the results of the "diagnostic scan" provided by the software were, in fact, false. Fix-It Utilities did not—and could not— perform an actual evaluation of Plaintiff's and the Class's computers or any problems existing on them, and did not function as Avanquest described.

50. Avanquest has violated the "unfair" prong of the Consumer Fraud Act in that it caused substantial injury to consumers through its actions identified above. The injury caused by Avanquest's conduct is not outweighed by any countervailing benefits to consumers, and the injury is one that consumers themselves could not have reasonably avoided. Given the information asymmetry between Avanquest and consumers regarding Fix-It Utilities' functionality, Avanquest knew or had reason to know that Plaintiff and the Class could not reasonably have known of or discovered the falsity of Avanquest's representations or avoided the harm those misrepresentations caused.

51. Avanquest has also violated the "fraudulent" prong of the Consumer Fraud Act in that its statements, advertisements, and representations regarding the utility and functionality of Fix-It Utilities—substantially similar to those depicted in Figure 6 and otherwise described in Paragraph 13–14—and the results of the software's scans are false and likely to deceive a reasonable consumer, as described in Section IV.

52. Avanquest's fraudulent, unfair, and unlawful conduct directly and proximately

caused Plaintiff and the Class actual monetary damages in the form of the price paid for the Fix-It Utilities software—typically $39.95.

53.     Accordingly, Plaintiff seeks an order: (i) permanently enjoining Avanquest from continuing to engage in fraudulent, unfair, and unlawful conduct; (ii) requiring Avanquest to pay actual and compensatory damages; and (iii) requiring Avanquest to pay interest, attorneys' fees, and costs.

<div align="center">

**SECOND CAUSE OF ACTION**
**Fraudulent Inducement**
**(On Behalf of Plaintiff and the Class)**

</div>

54.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

55.     As described in particularity in Section II above, and as described throughout this Complaint, Avanquest has used, and continues to use, marketing tactics it knows or reasonably should know are false and misleading.

56.     To induce Plaintiff and the Class into purchasing and/or continuing to use Fix-It Utilities, Avanquest affirmatively represented that Fix-It Utilities provided a certain level of utility. Specifically, Avanquest represented that Fix-It Utilities would honestly and accurately scan consumers' PC's for harmful problems, increase a PC's speed and stability, improve the speed of their Internet connections, protect their computers from security threats, and otherwise perform the beneficial tasks depicted in Figure 6 and described in Section II.

57.     Avanquest's affirmative representations were, in fact, false. In particular, Fix-It Utilities does not—and cannot—increase a computer's performance and stability in the manner Avanquest described.

58.     The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase and/or continue to use a product. Any deception or fraud related to the utility of a product is materially

misleading.

59.     As Fix-It Utilities' developer, Avanquest knew that its representations about Fix-It Utilities' functional capability were false. Avanquest intentionally designed its public representations to mislead consumers about Fix-It Utilities' functional capabilities and programmed the software to falsely report that problems exist on a user's computer and to deceive users about their PC's true conditions.

60.     Avanquest made these misrepresentations with the intent to induce Plaintiff and the Class to rely upon them by purchasing and/or continuing to use Fix-It Utilities.

61.     As consumers lacking the requisite technical expertise to independently gauge Fix-It Utilities' underlying functionality, and taking Avanquest's statements at face value, Plaintiff and the Class justifiably relied upon Avanquest's misrepresentations by purchasing and continuing to use Fix-It Utilities. They would not have purchased, nor continued to use, Fix-It Utilities but for the misrepresentations that their PCs were in need of repair and that Fix-It Utilities was capable of making such repairs.

62.     As a result of their reasonable reliance on Avanquest's misrepresentations, Plaintiff and the Class have been damaged in the amount of Fix-It Utilities' purchase price (typically $39.95), or at least a portion thereof.

63.     Plaintiff therefore prays for relief in the amount of the difference between the purchase price he and the Class paid for Fix-It Utilities and its actual value. Plaintiff further alleges that Avanquest's conduct and misrepresentations were made with malice and in conscious disregard of Plaintiff's and the Class's rights, thereby entitling them to punitive damages against Avanquest in an amount sufficient to deter such conduct in the future.

# THIRD CAUSE OF ACTION
## Breach of Contract
### (On Behalf of Plaintiff and the Class)

64.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

65.     Plaintiff and the Class members entered into agreements with Avanquest whereby Avanquest agreed to sell, and Plaintiff and the Class agreed to purchase, software that would detect and remove legitimate computer problems from Plaintiff's and the Class's computers, and perform the beneficial tasks described in Section II and depicted in Figure 6.

66.     Based on the foregoing offer, Plaintiff and the Class agreed to purchase Avanquest's Fix-It Utilities software. Plaintiff and the Class paid, and Avanquest accepted, Fix-It Utilities' purchase price (approximately $39.95 in Plaintiff's case), and therefore performed their obligations under the contracts.

67.     Avanquest breached its contracts with Plaintiff and the Class by intentionally designing the software to mischaracterize the true condition of computers and further by failing to provide software that performed the tasks described in Section II and depicted in Figure 6. These obligations were material terms of the agreement.

68.     Further, Illinois contract law recognizes the implied covenant of good faith and fair dealing in every contract. Thus, implicit in its contracts with Plaintiff and the Class were provisions prohibiting Avanquest from engaging in conduct that frustrated or injured Plaintiff's and the Class's rights to receive the benefits of the agreement.

69.     Avanquest acted in bad faith and breached these provisions of the agreement, specifically by not honoring its responsibilities to perform truthful diagnostic and remedial operations, as described herein, and instead, providing software that it intentionally designed to produce false error reports, misrepresent the actual status of users' PCs, and was incapable of removing purported problems as advertised.

70. Furthermore, Avanquest was under an implicit obligation to comply with 815 ILCS 505/1, *et seq.*, to be truthful in its advertisements, and to accurately disclose the functionality and utility of its software. Avanquest did not honor any of these obligations.

71. Avanquest breached the implied covenant of good faith and fair dealing by failing to: (i) provide software that would perform the beneficial tasks described in Section II and depicted in Figure 6; (ii) honestly and accurately inform consumers about the true condition of their PCs; and (iii) fully comply with the proscriptions of applicable statutory law.

72. The aforementioned breaches of contract have directly and proximately caused Plaintiff and the Class economic injury and other damages, including in the form of the purchase price, or at least a portion thereof, of the Fix-It Utilities software, because they purchased a product that does not perform as Avanquest represented, and therefore lacks the promised and paid-for utility.

<div align="center">

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
*In the alternative to Breach of Contract*
**(On behalf of Plaintiff and the Class)**

</div>

73. Plaintiff incorporates the allegations in paragraphs 1-63 as if fully set forth herein.

74. If the Court finds Plaintiff's and the Class's contracts with Avanquest invalid, non-existent, or otherwise unenforceable, Plaintiff and the members of the Class may be left without any adequate remedy at law.

75. Plaintiff and the Class have conferred a benefit upon Avanquest in the form of the money Avanquest charged and collected from them for the purchase of the Fix-It Utilities software, which did not and could not perform as Avanquest promised.

76. Avanquest appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

77.     Under principles of equity and good conscience, Avanquest should not be permitted to retain the monies belonging to Plaintiff and the Class that it unjustly received as a result of its wrongful conduct described herein.

78.     Accordingly, Plaintiff, on behalf of himself and the other members of the Class, seeks restitution and disgorgement of all amounts by which Avanquest has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Quincey Robinson, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Robinson as representative of the Class, and appointing his counsel as Class Counsel;

B.     Declaring that Avanquest's actions, as set out above, constitute (i) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, (ii) fraudulent inducement, (iii) breach of contract, and (iv) unjust enrichment (in the alternative to breach of contract);

C.     Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an order (i) prohibiting Avanquest from engaging in the wrongful and unlawful acts described herein, (ii) requiring Avanquest to disclose and admit the wrongful and unlawful acts described herein, and (iii) requiring Avanquest to fully disclose the true nature of its software products in the future;

D.     Awarding damages to Plaintiff and the Class in an amount to be determined at trial;

E.     Awarding restitution to Plaintiff and the Class in an amount to be determined at trial, and disgorging all amounts by which Avanquest has been unjustly enriched;

F.     Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.     Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H.     Entering such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

I.     Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**QUINCEY ROBINSON**, individually and on behalf of all others similarly situated,

Dated: September 15, 2014

By: _____
One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Courtney E. Booth
cbooth@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

FILED-CH
LERK OF THE CIRCUIT COURT
CHANCERY DIVISION
2014 SEP 15 PM 1: 13
CLERK
DOROTHY BROWN

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| QUINCEY ROBINSON, individually and on behalf of all others similarly situated, | Case No. 14 CH 14 861 |
| *Plaintiff,* | |
| *v.* | |
| AVANQUEST NORTH AMERICA INC., a California corporation, and AVANQUEST SOFTWARE S.A., a French company, | |
| *Defendants.* | |

## PLAINTIFF'S MOTION FOR AND MEMORANDUM
## IN SUPPORT OF CLASS CERTIFICATION

Plaintiff Quincey Robinson, by and through his undersigned counsel, hereby respectfully

moves the Court for an Order certifying this case as a class action pursuant to Section 2-801 of

the Illinois Code of Civil Procedure ("Section 2-801"), but requests that the Court enter and

continue the instant motion until after the completion of discovery on class-wide issues, at which

time Plaintiff will submit a fulsome memorandum of points and authorities in support of class

certification.[1]

## I.     INTRODUCTION.

Even at this early stage of the litigation, this case presents a textbook example of an

---

[1]     Plaintiff filed this motion at the outset of the litigation to prevent Defendants from attempting a so-called "buy off" to moot his representative claims (*i.e.*, tendering to him the full amount of his individual damages alleged in his Class Action Complaint and Demand for Jury Trial ("Complaint")). *See Damasco v. Clearwire Corp.*, 662 F.3d 891, 896 (7th Cir. 2011) ("Class-action plaintiffs can move to certify the class at the same time that they file their complaint. The pendency of that motion protects a putative class from attempts to buy off the named plaintiffs . . . If the parties have yet to fully develop the facts needed for certification, then they can also ask the district court to delay its ruling to provide time for additional discovery or investigation.").

action appropriate for class certification. Defendants Avanquest North America Inc. and Avanquest Software S.A. (collectively referred to in the singular as "Avanquest") uniformly promised Plaintiff Robinson and a putative class of consumers that their Fix-It Utilities Professional software ("Fix-It Utilities") would increase the speed, performance, and stability of their personal computers ("PC"), protect against privacy risks, remove harmful errors, and improve Internet speeds. The problem with Fix-It Utilities, however, and what prompted this lawsuit, is that the software isn't actually capable of performing a credible diagnostic test of a PC and cannot, among other things, actually remove damaging PC errors, appreciably improve a computer's boot time, nor prevent the common causes of system freezes, as promised. Instead, Avanquest intentionally designed Fix-It Utilities to invariably report that harmful errors and threats exist on a computer, regardless of its actual condition.

Plaintiff Robinson is one such consumer who was misled into purchasing Fix-It Utilities. In light of Avanquest's conduct, Robinson filed the instant lawsuit and now respectfully moves the Court for an Order certifying this case as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure. As discussed more fully below, Robinson's claims are readily certifiable because potentially thousands of consumers, like himself, were subjected to Avanquest's uniform misrepresentations that Fix-It Utilities would accurately identify, report, and repair errors and speed up their PCs. As a result—and regardless of which specific advertisement they viewed—every member of the putative Class (defined below) purchased software that uniformly failed to perform the beneficial tasks advertised by Avanquest and suffered injury in a nearly identical manner (*i.e.*, damages in the form of the difference between what they paid for the software and what it is actually worth).

Accordingly, the proposed Class in this case meets each of the prerequisites under

2

Section 2-801 and class treatment of Plaintiff's and the Class's claims is appropriate.

## II.  FACTUAL BACKGROUND.

### A.  Facts Applicable to All Members of the Putative Class.

Through its marketing materials and advertisements contained on its websites and product packaging, Avanquest claims that Fix-It Utilities is capable of detecting and repairing a wide range of PC errors, privacy threats, viruses, and other computer problems. (*See* Complaint ¶ 2.) Avanquest also promises that Fix-It Utilities will increase system startup speeds, prevent crashes and freezes, optimize a PC's performance, and remove security risks. (*Id.*) Unfortunately for consumers, Fix-It Utilities is not actually capable of *performing a credible diagnostic test* of a PC and cannot actually remove damaging PC errors, appreciably improve a computer's boot time, nor prevent the common causes of system freezes, as promised. (*Id.* ¶ 3.) In reality, Avanquest intentionally designed Fix-It Utilities to invariably report that harmful errors and threats exist on a computer, regardless of its actual condition. (*Id.*) As a result, thousands of consumers have been tricked into buying software that does not—and cannot—perform the functions promised. (*Id.* ¶ 4.)

### B.  Facts Applicable to Plaintiff Robinson.

Plaintiff Robinson is just one of potentially thousands of consumers who purchased Avanquest's Fix-It Utilities software. Specifically, in late 2013, Plaintiff Robinson visited his local office supply store to search for software that would increase the speed, performance, and stability of his PC, protect against privacy risks, remove harmful errors and improve his Internet speeds. (Complaint ¶ 35.) At the store, Robinson discovered Avanquest's Fix-It Utilities 14 Professional. (*Id.*) Robinson proceeded to read the representations made by Avanquest on the software's box and packaging materials. (*Id.*) Relying upon the representations made by

3

Avanquest—namely, Avanquest's claims that Fix-It Utilities would "Fix, Speed Up and Maintain [his] PC", "Keep[ his] PC running like new", "Intelligently Identif[y] system slowdowns", "Fix[] problems and speed[] up Windows", and "Stop[] PC crashes and freezes"— Robinson purchased Fix-It Utilities 14 Professional software for approximately $39.95. (*Id.* ¶ 36.) Unfortunately, as previewed above and described more fully in the Complaint, the truth is that the Fix-It Utilities software Robinson purchased did not—and could not—perform as advertised. (*Id.* ¶ 37.)

### C. The Proposed Class.

As a result of Avanquest's conduct described above, Robinson brought the instant lawsuit and now seeks certification of a class of similarly situated consumers, defined as follows:

> All residents of the State of Illinois who purchased Avanquest's Fix-It Utilities Professional software.[2]

(Complaint ¶ 39.) As demonstrated below, the proposed Class meets each of the requisites to certification under Section 2-801 and therefore, the instant motion should be granted in its entirety.

## III. THE PROPOSED CLASS SATISFIES EACH OF THE REQUIREMENTS FOR CERTIFICATION.

To obtain class certification, it is not necessary for a plaintiff to establish that he or she will prevail on the merits of the action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will

---

[2] The following individuals and entities are excluded from the Class: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released, and (5) the legal representatives, successors, or assigns of any such excluded person.

prevail on the merits. but rather whether the requirements of Rule 23 are met") (internal quotation marks and citation omitted).[3] As such, in determining whether to certify a proposed class, courts generally accept the allegations of a complaint as true, *Ramirez v. Midway Moving & Storage, Inc.*, 378 Ill. App. 3d 51, 53 (1st Dist. 2007) (quoting *Clark v. TAP Pharm. Prods., Inc.*, 343 Ill. App. 3d 538, 544-45 (5th Dist. 2003)), and "should err in favor of maintaining class [certification.]" *Id.* (quoting *Clark*, 343 Ill App. 3d at 545).

To proceed with a class action here, Plaintiff must demonstrate that: "(1) [t]he class is so numerous that joinder of all members is impracticable[;] (2) [t]here are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members[;] (3) [t]he representative parties will fairly and adequately protect the interest of the class[; and] (4) [t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801; *see also Lee v. Allstate Life Ins. Co.*, 361 Ill. App. 3d 970, 974 (Ill. App. Ct. 2005). As shown below, the proposed Class meets each of Section 2-801's prerequisites and should be certified.

A.     **Numerosity: The Proposed Class is Sufficiently Numerous.**

The first step in certifying a class is showing that "the class is so numerous that joinder of all members is impracticable." 735 ILCS 5/2-801(1). This requirement is met when joining "such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon v. Boden*, 224 Ill. App. 3d 195, 200 (Ill. App. Ct. 1991) (citing *Steinberg v. Chicago Med. Sch.*, 69 Ill. 2d 320, 337 (1977)). "Plaintiffs need not demonstrate a precise figure for the class size,

---

[3]     Section 2-801 is modeled after Rule 23 of the Federal Rules of Civil Procedure and, therefore, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois. *See Avery v. State Farm Mutual Auto. Ins. Co.*, 216 Ill. 2d 100, 125 (2005).

because a good-faith, nonspeculative estimate will suffice." *Cruz v. Unilock Chicago*, 383 Ill. App. 3d 752, 771 (Ill. App. Ct. 2008). Generally, "[t]he court is permitted to make common-sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs., LLC*, 2004 WL 719278, at *2 (N.D. Ill. Mar. 31, 2004); *see also* 3 ALBA CONTE & HERBERT B. NEWBERG, *Newberg on Class Actions* § 7.20, 66 (4th ed. 2001).

In this case, Plaintiff alleges—and believes discovery will show—that thousands of consumers purchased the Fix-It Utilities software. (Complaint ¶¶ 4, 40); *see Carrao v. Health Care Serv. Corp.*, 118 Ill. App. 3d 417, 427 (Ill. App. Ct. 1983) ("allegation in the complaint that the class consists of over 1,000 members provides an ample basis for the trial court's conclusion that joinder of all members is impracticable"); *Heastie v. Comm. Bank of Greater Peoria*, 125 F.R.D. 669, 673 (N.D. Ill. 1989) (classes numbering in the thousands "clearly" satisfy the numerosity requirement); *Kulins v. Maleo. A Microdot Co.*, 121 Ill. App. 3d 520, 530 (Ill. Ct. App. 1984) (finding that in Cook County, 30 class members was sufficient to satisfy numerosity to lessen the backlog of cases before the court). Further, joinder of the Class's claims would be impracticable because their claims are small relative to the resources necessary to prosecute the claims in question. As such, absent a class action, few individuals could afford to bring an individual lawsuit over the amounts at issue. *See Gordon*, 224 Ill. App. 3d at 204.

Accordingly, the first prerequisite for class certification is met.[4]

### B.     Commonality and Predominance: The Proposed Class Shares Common Questions of Law and Fact that Predominate Over Any Individual Issues.

Section 2-801's second prerequisite requires that there are "questions of fact or law common to the class" and that those questions "predominate over any questions affecting only

---

[4]     To the extent the Court requires additional details regarding the number of members in the Class, such information may be readily obtained through discovery.

individual members." 735 ILCS 5/2-801(2). Common questions of law or fact are typically found to exist when the members of a proposed class have been aggrieved by the same or similar misconduct. *See Miner v. Gillette Co.*, 87 Ill. 2d 7, 17 (1981); *Steinberg*, 69 Ill. 2d at 341; *McCarthy v. LaSalle Nat'l Bank & Trust Co.*, 230 Ill. App. 3d 628, 634 (Ill. Ct. App. 1992). After common questions of law or fact have been identified, these common questions must also predominate over any issues affecting only individual class members. *See O-Kay Shoes, Inc. v. Rosewell*, 129 Ill. App. 3d 405, 408 (Ill. Ct. App. 1984). Ultimately, commonality is a relatively low and easily surmountable hurdle. *See Scholes v. Stone, McGuire, & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-132 (2009)).

As alleged in this case, all members of the proposed Class share common questions of fact that predominate over issues affecting only individual members. Those common factual issues include: (1) whether Avanquest intentionally designed Fix-It Utilities to invariably report that harmful problems and threats exist on a user's PC, regardless of the computer's actual condition; and (2) whether Avanquest intentionally misrepresented the functionality of Fix-It Utilities. (Complaint ¶ 41.) Those common factual questions also lead to several legal questions common to the Class, including: (1) whether Avanquest's conduct described herein constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*; (2) whether Avanquest's conduct constitutes fraudulent inducement; (3) whether Avanquest's conduct constitutes a breach of contract; and (4) whether Avanquest has been

7

unjustly enriched as a result of its conduct. (*Id.*)

Accordingly, Section 2-801's commonality and predominance requirements are met and any potentially missing information can be secured through discovery.

## C.    Adequacy of Representation: Plaintiff and His Counsel are Adequate Representatives of, and Have No Conflicts with, the Members of the Class.

The third prerequisite of Section 2-801 requires that "[t]he representative parties will fairly and adequately protect the interest of the class." 735 ILCS 5/2-801(3). The purpose of the adequacy of representation requirement is "to insure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." *Purcell and Wardrope Chtd. v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1078 (Ill. Ct. App. 1988); *Gordon*, 224 Ill. App. 3d at 203.

In this case, Robinson has the same interests as the proposed Class: recovering the money that they paid for the Fix-It Utilities software that did not (and could not) perform as advertised, and obtaining the injunctive relief necessary to ensure that Avanquest does not continue its unlawful conduct into the future. (Complaint ¶¶ 3–4, 17, 31–34, 37, 53, 63, 72, 78.) Robinson has no interests antagonistic to those of the Class and therefore, will fairly and adequately protect the interests of the Class; his pursuit of the instant action demonstrates as much. (*Id.* ¶ 42.)

Similarly, Plaintiff's counsel are well-respected members of the legal community who have extensive experience in class actions of similar size, scope, and complexity to the instant action. (*Id.*) They have regularly engaged in major complex litigation involving consumer technology issues, have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead class counsel by courts throughout the country. (*See* Firm Resume of Edelson PC, attached as Exhibit 1-A to the Declaration of Benjamin H. Richman ("Richman Decl.").) To date, proposed class counsel have also diligently investigated and

dedicated substantial resources to the claims in this action, and they will continue to do so throughout its pendency. (Richman Decl. ¶ 4.) And, with respect to specific experience handling class actions of this sort, proposed class counsel have in the past and are currently prosecuting numerous class actions related to the alleged deceptive design and marketing of software products similar to those at issue here, including a class action against Avanquest arising out of virtually identical software products. *See Boyd v. Avanquest N. Am., Inc.*, No. 12-cv-4391-WHO (N.D. Cal.); *see also Drymon, et al. v. Cyberdefender Corp.*, No. 11 CH 16779 (Cir. Ct. Cook County, Ill.); *Webb, et al. v. Cleverbridge, Inc., et al.*, No. 11-cv-04141 (N.D. Ill.); *Ledet v. Ascentive, LLC*, No. 11-cv-00294 (E.D. Pa.); *Rottner v. AVG Techs., CZ, s.r.o.*, No. 12-cv-10920 (D. Mass.); *Hall v. TuneUp Corp.*, No. 1:13-cv-1804 (N.D. Ill.).

As such, Robinson and his counsel have and will continue to adequately represent the Class, and Section 2-801's adequacy requirement is met as well.

**D.     Appropriateness: This Class Action is the Most Appropriate Method to Adjudicate the Claims in Question.**

The final prerequisite to class certification is met where "[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801(4). "In applying this prerequisite in a particular case, a court considers whether a class action: (1) can best secure the economies of time, effort and expense, and promote uniformity; or (2) accomplish the other ends of equity and justice that class actions seek to obtain." *Gordon*, 224 Ill. App. 3d at 203. In practice, a "holding that the first three prerequisites of section 2-801 are established makes it evident that the fourth requirement is fulfilled." *Id.* at 204; *Purcell and Wardrope Chtd.*, 175 Ill. App. 3d at 1079 ("the predominance of common issues [may] make a class action . . . a fair and efficient method to resolve the dispute."). Additionally, a "controlling factor in many cases is that the class action is the only practical means for class members to

9

receive redress . . . ." *Gordon*, 224 Ill. App. 3d at 203; *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill. App. 3d 995, 1004 (Ill. App. Ct. 1991) ("In a large and impersonal society, class actions are often the last barricade of consumer protection.").

Under the circumstances of this case, a class action is the most appropriate method for the fair and efficient adjudication of the claims of Plaintiff and the proposed Class. The injuries suffered by individual members of the proposed Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Avanquest's conduct. (*See* Complaint ¶¶ 43, 52 (identifying the typical purchase price of Fix-It Utilities as $39.95).) Thus, absent a class action, it would be difficult, if not impossible, for the individual members of the proposed Class to obtain effective relief. (*Id.* ¶ 43.) Maintenance of this case as a class action is also appropriate because it would avoid the necessity for multiple adjudications of identical legal and factual issues, thereby reducing the burden on the parties and the judiciary. (*Id.*) Likewise, the fact that Section 2-801's numerosity, commonality and predominance, and adequacy of representation requirements have been satisfied, further demonstrates the appropriateness of proceeding with this case as a class action.

Accordingly, Section 2-801's final prerequisite is satisfied and the proposed Class warrants certification.

## IV. CONCLUSION.

For the reasons stated above, and which will be borne out by class discovery, this case is appropriate for class certification. Accordingly, Plaintiff Quincey Robinson, individually and on behalf of the proposed Class, respectfully requests that the Court: (1) enter and reserve ruling on Plaintiff's motion for class certification; (2) allow for discovery to take place; (3) grant Plaintiff leave to file an amended motion upon the conclusion of discovery relating to certification issues;

(4) grant Plaintiff's motion for class certification after full briefing; and (5) provide all other and further relief that the Court deems reasonable and just.[5]

<div style="margin-left: 40%;">

Respectfully submitted,

**QUINCEY ROBINSON**, individually and on behalf of all others similarly situated,

By: _____

One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Courtney E. Booth
cbooth@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

</div>

Dated: September 15, 2014

---

[5] Plaintiff respectfully reserves the right to amend the definition of the proposed Class and provide other factual support as appropriate after certification-related discovery.

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| QUINCEY ROBINSON, individually and on behalf of all others similarly situated, | Case No. 14CH14861 |
| *Plaintiff,* | DOROTHY BROWN CLERK |
| *v.* | |
| AVANQUEST NORTH AMERICA INC., a California corporation, and AVANQUEST SOFTWARE S.A., a French company, | |
| *Defendants.* | |

## DECLARATION OF BENJAMIN H. RICHMAN

I, Benjamin H. Richman, pursuant to Section 1-109 of the Illinois Code of Civil Procedure, hereby declare as follows:

1.     I am a Partner at the law firm of Edelson PC, which has been retained to represent Plaintiff Quincey Robinson in this matter. I am an adult over the age of eighteen and I am fully competent to make this declaration. I have personal knowledge of all matters set forth herein unless otherwise indicated. If called to testify as to the matters stated herein, I could and would competently do so. I make this declaration in support of Plaintiff's Motion for Class Certification.

2.     Attached as Exhibit 1-A is a true and accurate copy of the Firm Resume of Edelson PC ("Firm Resume").

3.     As shown in the Firm Resume, my firm has regularly engaged in major complex litigation, and has extensive experience in class actions of similar size, scope, and complexity to the instant action. Moreover, my firm has regularly engaged in major complex litigation

1

involving consumer technology issues, has the resources necessary to conduct litigation of this nature, and has frequently been appointed lead class counsel by courts throughout the country.

4.      To date, my firm has already diligently investigated and dedicated substantial resources to the investigation of the claims at issue in this action, and will continue to do so throughout its pendency.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of September 2014 at Chicago, Illinois.

Benjamin H. Richman

# **EXHIBIT 1-A**

EDELSON PC is a plaintiff's class action and commercial litigation firm with attorneys in Illinois, Colorado and California.

Our attorneys have been recognized as leaders in these fields by state and federal legislatures, national and international media groups, the courts, and our peers. Our reputation for leadership in class action litigation has led state and federal courts to appoint us lead counsel in many high-profile class action suits, including privacy class actions involving comScore, Netflix, Time, Microsoft, and Facebook, numerous Telephone Consumer Protection Act ("TCPA") against companies such as Google, Twentieth Century Fox, and Simon & Schuester, class actions against Citibank, Wells Fargo, and JP Morgan Chase related to reductions in home equity lines of credit, fraudulent marketing cases against software companies such as Symantec, mobile content class actions against all major cellular telephone carriers, the Thomas the Tank Engine lead paint class actions, and the tainted pet food litigation. We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy and other issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally. Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools and are asked to serve as testifying experts in cases involving class action and consumer issues.

## PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON PC is a leader in plaintiffs' class and mass action litigation, with a particular emphasis on consumer technology class actions, and has been called a "class action 'super firm'". (Decalogue Society of Lawyers, Spring 2010.) As recognized by federal courts nationwide, our firm has an "extensive histor[y] of experience in complex class action litigation, and [is a] well-respected law firm[] in the plaintiffs' class action bar." *In re Pet Food Prod. Liab. Litig.*, MDL Dkt. No. 1850, No. 07-2867 (NLH) (D.N.J. Nov. 18, 2008). A leading arbitrator concurred: "The proof of [the firm's] experience, reputation, and abilities is extraordinary. . . . Each [of their cases] elaborates on the experience and unique success [they] have had in achieving leading roles in the area of 'technology consumer protection class actions.'" (Arbitration award in mobile content class action settlement, August 6, 2009)

In appointing our firm interim co-lead in one of the most high profile cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries." - *In Re JPMorgan Chase Home Equity Line of Credit Litig.*, No. 10 C 3647 (N.D. Ill, July 16, 2010). After hard fought litigation, that case settled, resulting in the reinstatement of between $3.2 billion and $4.7 billion in home credit lines.

We have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal) (order appointing the firm interim co-lead of privacy class action); see also In re Netflix Privacy Litigation, 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing the sole lead counsel due, in part, to its "significant and particularly

specialized expertise in electronic privacy litigation and class actions[.]")

Similarly, as recognized by a recent federal court, our firm has "pioneered the application of the TCPA to text-messaging technology, litigating some of the largest consumer class actions in the country on this issue." *Ellison v Steve Madden, Ltd.*, cv 11-5935 PSG (C.D. Cal. May 7, 2013).

We have several sub-specialties within our plaintiffs' class action practice:

### *Privacy/Data Loss*

#### Data Loss/Unauthorized Disclosure of Data

We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Red Box, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft and others involving the failure to protect customers' private information, security breaches, and unauthorized sharing of personal information with third parties. Representative settlements and ongoing cases include:

- *Dunstan v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.): Lead counsel in certified class action accusing internet analytics company of improper data collection practices.

- *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.): Lead counsel in data breach case filed against health insurance company. Obtained landmark appellate decision endorsing common law unjust enrichment theory, irrespective of whether identity theft occurred.

- *In re Netflix Privacy Litigation*, No. 5:11-cv-00379 (N.D. Cal.): Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act by illegally retaining customer viewing information. Case resulted in a $9 million dollar cy pres settlement that has been finally approved (pending appeal).

- *Halaburda v. Bauer Publishing Co.* 12-CV-12831 (E.D. Mich.), *Grenke v. Hearst Communications, Inc.*, 12-CV-14221 (E.D. Mich.), *Fox v. Time, Inc.*, 12-CV-14390 (E.D. Mich.) Consolidated actions brought under Michigan's Video Rental Privacy Act, alleging unlawful disclosure of subscribers' personal information. In a ground-breaking decision, the court denied three motions to dismiss finding that the magazine publishers were covered by the act and that the illegal sale of personal information triggers an automatic $5,000 award to each aggrieved consumer.

- *Standiford v. Palm*, No. 5:09-cv-05719-LHK (N.D. Cal.): Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litigation*, 10-cv-04680 (N.D. Cal.): Appointed co-lead counsel in suit against gaming application designer for the alleged

unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *In re Facebook Privacy Litigation.* 10-cv-02389 (N.D. Cal.): Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *In re Sidekick Litig..* No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Desantis v. Sears,* 08 CH 00448 (Cook County, IL): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the internet.

## Telephone Consumer Protection Act

Edelson has been at the forefront to TCPA litigation for over six years, having secured the groundbreaking *Satterfield* ruling in the Ninth Circuit applying the TCPA to text messages. In addition to numerous settlements totaling over $100 million in relief to consumers, we have over two dozen putative TCPA class actions pending against companies including Santander Consumer USA, Inc., Walgreen Co., Path, Inc., Nuance Communications, Inc., Stonebridge Life Insurance, Inc., UnitedHealth Group, Inc., GEICO, DirectBuy, Inc., and RCI, Inc. Representative settlements and ongoing cases include:

- *Rojas v CEC,* No. 1:10-cv-05260 (N.D. Ill): Lead counsel in text spam class action that settled for $19,999,400.

- *In re Jiffy Lube Int'l Text Spam Litig,* No. 11-md-2261, 2012 WL 762888 (S.D. Cal. March 9, 2012): Co-lead counsel in $35 million text spam settlement.

- *Ellison v Steve Madden, Ltd.,* cv 11-5935 PSG (C.D.Cal.): Lead counsel in $10 million text spam settlement.

- *Kramer v. B2Mobile, et al,* No. 0-cv-02722-CW (N.D. Cal.): Lead counsel in $12.2 million text spam settlement.

- *Pimental v. Google, Inc.,* No. 11-cv-02585 (N.D.Cal.): Lead counsel in class action alleging that defendant co-opted group text messaging lists to send unsolicited text messages. $6 million settlement provides class members with an unprecedented $500 recovery.

- *Robles v. Lucky Brand Dungarees, Inc.,* No. 10-cv-04846 (N.D.Cal.).

Lead counsel in $10 million text spam settlement.

- *Miller v. Red Bull*, No. 12-CV-04961 (N.D. Ill.) Lead counsel in preliminary approved $6 million settlement.

- *Woodman et al v. ADP Dealer Services, et al.*, 2013 CH 10169 (Cook County, IL) Lead counsel in $7.5 million text spam settlement.

- *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill): Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers. Case settled for $16 million.

- *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.). Co-lead counsel in in $10 million text spam settlement.

- *Weinstein, et al. v. Airit2me. Inc.*, Case No. 06 C 0484 (N.D. Ill): Co-lead counsel in $7 million text spam settlement.

*Consumer Technology*

**Fraudulent Software**

In addition to the settlements listed below, Edelson PC has consumer fraud cases pending in courts nationwide against companies such as McAfee, Inc., Avanquest North America Inc., PC Cleaner, AVG, iolo Technologies, LLC, among others. Representative settlements include:

- *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cook County, IL): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.75 million.

- *Gross v. Symantec Corp., et al.*, No. 3:12-cv-00154-CRB (N.D. Cal.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $11 million.

- *LaGarde, et al. v. Support.com, Inc., et al.* (N.D. Cal.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $8.59 million.

- *Ledet v. Ascentive LLC* (E.D. Pa.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.6 million.

- *Webb, et al. v. Cleverbridge, Inc.*, et al. (N.D. Ill.) Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $5.5 million.

**Video Games**

Edelson PC has litigated cases video game related cases against Activision Blizzard Inc., Electronic Arts, Inc., Google, and Zenimax Media, Inc., and has active litigation pending, including:

- *Locke v. Sega of America*, 13-cv-01962-MEJ (N.D. Cal.) Pending putative class action alleging that Sega of America and Gearbox Software released video game trailer that falsely represented the actual content of the game.

### *Mortgage & Banking*

EDELSON PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks. Our suits include claims that the certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs. We achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law. The court noted that "Prompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J., concurring). Our settlements have restored billions of dollars in home credit lines to people throughout the country. Representative cases and settlements include:

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, 10-cv-3647 (N.D. Ill.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Settlement restored between $3.2 billion and $4.7 billion in credit to the class.

- *Hamilton v. Wells Fargo Bank, N.A.*, 4:09-cv-04152-CW (N.D. Cal.). Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over $1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re Citibank HELOC Reduction Litigation*, 09-CV-0350-MMC. Lead counsel in class actions challenging Citibanks's suspensions of home equity lines of credit. The settlement restored up to $653,920,000 worth of credit to affected borrowers.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D. Ill.): In ongoing putative class action, obtained first appellate decision in the country recognizing the right of private litigants to sue to enforce HAMP trial plans.

***General Consumer Protection Class Actions***

We have successfully prosecuted countless class action suits against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers. In addition to the settlements listed below, Edelson PC has consumer fraud cases pending in courts nationwide against companies such as Motorola Mobility, Stonebridge Benefit Services, J.C. Penney, Sempris LLC, and Plimus, LLC. Representative settlements include:

## Mobile Content

We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton County Sup. Ct., GA): Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation. "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cook County, Illinois): Lead counsel in class action settlement involving 27 related cases alleging unauthorized mobile content charges. Case settled for $36 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Case settled for $12 million.

- *Parone v. m-Qube, Inc.* No. 08 CH 15834 (Cook County, Illinois): Lead counsel in class action settlement involving over 2 dozen cases alleging the imposition of unauthorized mobile content charges. Case settled for $12.254 million.

- *Williams, et al. v. Motricity, Inc. et al.*, Case No. 09 CH 19089 (Cook County, Illinois): Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.): Lead counsel in class action settlement alleging unauthorized mobile content charges. Case settled for $7.6 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (Los Angeles Sup. Ct.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Settlement provided class members with full refunds.

- *Abrams v. Facebook, Inc.*, No. 07-05378 (N.D. Cal.): Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

## Deceptive Marketing

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D. Ill): Lead counsel in negative option marketing class action. Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 1:10-cv-02964 (N.D. Ill): Lead counsel in class action alleging deceptive marketing aimed at small businesses. Case settled for $6 million.

- *Farrell v. OpenTable*, No 3:11-cv-01785-si (N.D. Cal.): Lead counsel in gift certificate expiration case. Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763-crb (N.D. Cal): Lead counsel in CROA class action. Settlement resulted in over $6 million of benefits to the class.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cook County, IL): Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cook County, IL): Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill): Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill): Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cook County, IL): Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cook County, IL): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

- *Zurakov v. Register.com*, No. 01-600703 (New York County, NY): Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its allegedly deceptive practices in advertising on "coming soon" pages of newly registered Internet domain names. Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

### *Products Liability Class Actions*

We have been appointed lead counsel in state and federal products liability class settlements, including a $30, million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada. Representative settlements include:

- *Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cook County, IL): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.*, No. 07-2867 (D. N.J.): Part of mediation team in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

### *Insurance Class Actions*

We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds. Representative settlements include:

- *Holloway v. J.C. Penney*, No. 97 C 4555, (N.D. Ill.): One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class. The case settled in or around December of 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI): Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually

settled the case ensuring that each class member would remain insured.

### *Mass/Class Tort Cases*

Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions. Representative settlements include:

- *Aaron v. Chicago Housing Authority.* 99 L 11738, (Cook County, IL): Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond,* No. 2:00CV352JM (N.D. Ind.): Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

### GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes, to litigation involving corporate takeovers. We have handled cases involving tens of thousands of dollars to "bet the company" cases involving up to hundreds of millions of dollars. Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations.

### OUR ATTORNEYS

**JAY EDELSON** is the founder and Managing Partner of EDELSON PC. He has been recognized as one of the nation's leading class action lawyers, especially in the areas of privacy, technology, and consumer advocacy. His notable cases include ones involving the national banks' suspensions of home equity lines of credit in the aftermath of the housing collapse, which resulted in the restoration of billions of dollars of consumer credit lines. He has developed much of the positive law under the Telephone Consumer Privacy Act, especially in the area of text message spam, resulting in settlements collectively worth over a hundred millions of dollars and earning him the moniker, "the Spam Slammer". Jay has been recognized as a "pioneer" in the emerging field of electronic privacy, having established key precedent in cases throughout the country and reaching some of the most important settlements in this space. In addition to

complex defense-side litigation, which he handles only in select cases, Jay also offers strategic support to start-ups, including several that have become national brands.

Jay is a frequent speaker and writer on class action issues, the practice of law more generally, and training and law firm management -- the latter earning him recognition by the ABA as one of "the most creative minds in the legal industry". He is an adjunct professor at Chicago-Kent School of Law, where he has taught seminars on class actions and negotiation. He writes a blog for Thomson Reuters, called Pardon the Disruption, where he focuses on ideas necessary to reform and reinvent the legal industry.

### Representative Plaintiff's Class Actions:

- Lead counsel in over a half-dozen nationwide class action settlements collectively worth hundreds of millions of dollars involving claims of unauthorized charges on cellular telephones.
- Recognized as one of the "pioneers" of privacy class action litigation, having successfully litigated cases involving claims of privacy breaches or intrusive behavior against companies such as Netflix, Facebook, Microsoft, and Sears.
- Lead counsel on behalf of the largest adversarially certified privacy class action in the nation.
- Lead counsel in "crptocurrency" class action case against Mt. Gox -- a virtual currency exchange that lost hundreds of millions of dollars worth of bitcoins.
- Lead counsel in numerous text message spam class actions, including a $35 million settlement involving Jiffy Lube, a $20 million settlement involving a for-profit college, a $16 million settlement involving 20th Century Fox, a $10 million settlement involving Simon & Schuster and a $7 million settlement involving the Timberland Co.
- Successfully prosecuted class actions against the major banks for suspending home credit lines in the wake of the financial crash. Settlements restored billions of dollars in credit lines.
- Lead counsel in $30 million class action settlement involving lead-infused Thomas the Tank Engine children's toys.
- Part of a U.S. and Canadian class action mediation team obtaining a $24 million settlement involving the 2008 contaminated pet food recalls.
- Part of a team successfully representing personal injury claimants suffering from effects of second hand smoke while working at a riverboat casino.
- Obtained an injunction preventing an insurance company from canceling the health insurance of thousands of self-employed individuals, later reaching settlement guaranteeing them insurance for the future.

### Representative Commercial Litigation Matters:

- Represented one of the nation's largest mortgage lenders in multiple putative employment class actions, resolving them at a fraction of the normal budgets established simply to defend such cases .
- Represented leading advertising company in defense of consumer class action.

- Successfully resolved threatened multi-million dollar class action against technology company pre-suit for nuisance value.
- Successfully negotiated the abandonment of threatened mulit-million class action against advertising company involving digital rights.
- In a 2-1 split decision before the Court of Appeals for the Seventh Circuit, won the dismissal of all charges against former Governor Rod Blagojevich in 9-figure civil racketeering claims on the basis of legislative immunity.
- Successfully won multi-million dollar pre-suit settlement on behalf of technology company and its officers claiming professional negligence.
- Successfully defended several "bet the company" cases involving commercial disputes against marketing company, all resulting in "nuisance value" type settlements.

Representative Corporate Consulting:

- Advised start-up on host of legal issues, including reformulating their business plan to ensure compliance with myriad state regulatory schemes. Company later became recognized as one of the fastest growing businesses in Chicago.
- Consulted with successful mid-west technology company, also recognized as one of the fastest growing in the area.
- Consulted with health care company, including help with product launch and negotiation of licensing agreement.
- Consultant on several tech start-ups, providing legal and strategic advice, including helping to secure VC funds.

Awards and Honors:

- Named to Top 100 Trial Lawyers, by the National Trial Lawyers, 2013
- Selected as an Illinois Super Lawyer, 2012, 2013, 2014
- Benchmark Litigation: Top Illinois Plaintiff class action lawyer, 2013, 2014
- Named one of the top 40 Illinois attorneys under 40 by the Chicago Daily Law Bulletin's 2009. In that award, Jay was heralded for his history of bringing and winning landmark cases and for his "reputation for integrity" in the "rough and tumble class action arena." In the same award, he was called "one of the best in the country" when it "comes to legal strategy and execution."
- Included in the American Bar Association's "24 hours of Legal Rebels" program, where he was dubbed one of "the most creative minds in the legal profession" for his views of associate training and firm management.
- Presented with the Annual Humanitarian Award for his "personal integrity, professional achievements, and charitable contributions" by the Hope Presbyterian Church.

Teaching:

- Adjunct professor at Chicago-Kent College of Law, Class Action Litigation and Negotiation Seminar.

- Guest lecturer at Northwestern University Law School and The John Marshall Law School on consumer and class action issues.
- Faculty for The Sedona Conference Cooperation Training Program (Feb. 21-22, 2014) (clinical training on negotiation and cooperation techniques).

Media:

- Appeared on dozens of local, national, and international television and radio programs, including ABC World News, CNN, Your World With Neil Cavuto, Big Story with John Gibson, CBS Radio and NPR.
- Appeared in thousands of newspapers, magazines, and other publications.
- Nicknamed the "Spam Slammer" in Chicago Sun-Times' front- page cover article after reaching the first ever class action settlement for text message spam.

Public Speaking:

- Panelist for National Association of Attorneys General 2014 Spring Consumer Protection Seminar; "Data Breach and Privacy Panel" (May 19, 2014)
- Panelist for Perrin Webinar: "Sports Concussion Litigation- Latest NCAA and High School Research, Developments and Findings" (May 14, 2014)
- Panelist for Law Seminar International's Conference on Technology Law: "Plaintiff's Perspective on the Use of Big Data Class Actions as a Privacy and Security Enforcement Tool" (Dec. 12, 2013).
- Panelist for Law Seminar International's Conference on Litigating Class Actions: "Evolving Issues in Privacy Class Actions" (Dec. 10, 2013).
- Panelist for Pennsylvania Bar Institute seminar: "The FCC Cracks Down on Telemarking Again. The Regulatory and Litigation Climate of the Telephone Consumer Protection Act" (Dec. 10, 2013).
- Panelist for the NCLC Class Action Symposium: "Data Privacy Class Action Session" (Nov. 10, 2013).
- Panelist for The Sedona Conference on Cyber Liability (participated in three panels:"Private Data Breach Incidents," "Telecommunications & The Internet," and "Pushing the Boundaries of Cyber Liability") (Oct. 24-25, 2013).
- Panelist for NetDiligence 2013 Cyber Risk & Privacy Liability Forum - West Coast: "Data Breach Litigation Update." (Oct. 10, 2013).
- Panelist for ABA Dispute Resolution Conference: "Getting Arbitration Back on Track." (April 5, 2013).
- Panelist for PLI's conference: "Defending Privacy and Behavioral Advertising Class Action Suits 2013: What Every Litigator and In-House Lawyer Needs to Know." (January 22, 2013).
- Panelist discussing privacy class actions during for American Bar Association's 16th Annual National Institute on Class Actions (October 25, 2012).
- Panelist for ITT Chicago-Kent College of Law's "Conference on Internet Privacy, Social Networks and Data Aggregation" (March 23, 2012).

- Panelist for Chicago-Kent College of Law's "Class Dismissed? How the Supreme Court's Recent Decisions Have Shifted the Balance Between Individuals and Corporations" (November 2, 2011).
- Panelist for Daily Deal Media Conference 2011, Roundtable on Legal Landscape of the Daily Deal Industry (September 8, 2011).
- Panelist for Chicago Bar Association's Committee on Cyber Law and Data Privacy, Seminar on Consumer Privacy (June 10, 2011).
- Co-chair of CLE International's 2011 national multi-day conference on consumer class actions (May 12-13, 2011).
- Co-chair of CLE International's 2010 national multi-day conferences on consumer class actions (June 14-15, 2010).
- Panelist for Law Seminar International's "Trends in Federal Circuit Class Certification Rulings" (Nov. 4, 2010).
- Panelist at Decalogue Society of Lawyers' Symposium on "Representing Celebrity Clients" (Jan. 28, 2010).
- Panelist at DePaul University College of Law & The International Institute for Animal Law's symposium, "How Much is Fido/Fluffy Worth? Animal Valuation Issues Raised by the Pet Food Recall and Other Litigation" (Oct. 25, 2007).

Publications:

- "What's Past is Prologue: Snowden Leaks, New Domains, Global Jockeying For Internet Governance Role Still Dominate Cyberlaw Hot Topics in 2014," Bloomberg/BNA Electronic Commerce & Law Report, Feb. 3, 2014 (contributor).
- "Pardon the Disruption," Thomson Reuters Legal Blog, Nov. 7, 2013 through present.
- "The ATL Interrogatories: 10 Questions with Jay Edelson from Edelson PC," Above the Law, Oct. 16, 2013.
- "Beyond the Ping Pong Table: Lessons for Lawyers From Startup Companies," National Law Journal, Sept. 30, 2013.
- "End the Summer Associate Sideshow (and Start Treating Them Like the Almost-Lawyers They Are)," Bloomberg Law, Aug. 21, 2013.
- "Cbyerlaw Predictions: Privacy Litigation in the United States," Bloomberg/BNA, Jan. 2, 2013 (contributor).
- Preventing Your Daily Deals From Becoming Permanent Targets, Daily Deal Media, 2012 Daily Deal Industry Report.
- "Nine Mistakes Companies Make In Defending Themselves Against Consumer Class Action Lawsuits," Law360 (Jan. 2011).
- "Trust Young Lawyers and They Won't Let You Down," ABA Journal's Legal Rebels – Remaking the Profession (Oct. 15, 2009).
- "The YouTube Generation: Implications for Medical Professionalism," Perspectives in Biology and Medicine, Vol. 51, No. 4 (2008), pp. 517-524 (Contributor).

**RYAN D. ANDREWS** is a Partner at EDELSON PC and the Chair of the Telecommunications Practice Group. Mr. Andrews has been appointed class counsel in numerous state and federal class actions nationwide that have resulted in nearly $100 million dollars in refunds to consumers, including *Satterfield v. Simon & Schuster, Inc.*, No. C 06 2893 CW (N.D. Cal.), *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.), *Lofton v. Bank of America Corp.*, No. 07-5892 (N.D. Cal.), *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cook County, Ill.), *Parone v. m-Qube, Inc.* No. 08 CH 15834 (Cook County, Ill.), and *Kramer v. Autobytel, Inc.*, No. 10-cv-2722 (N.D. Cal. 2010).

In addition, Mr. Andrews has achieved groundbreaking court decisions protecting consumers through the application of the Telephone Consumer Protection Act to emerging text-messaging technology. Representative reported decisions include: Lozano v. Twentieth Century Fox, 702 F. Supp. 2d 999 (N.D. Ill. 2010), *Satterfield v. Simon & Schuster, Inc.* 569 F.3d 946 (9th Cir. 2009), and *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010), *In re Jiffy Lube Int'l Text Spam Litig,* --- F. Supp. 2d ---, No. 11-md-2261, 2012 WL 762888 (S.D. Cal. March 9, 2012).

Mr. Andrews received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Recently, Mr. Andrews has returned to Chicago-Kent as an Adjunct Professor of Law, teaching a third-year seminar on Class Actions. While in law school, Mr. Andrews was a Notes & Comments Editor for The Chicago-Kent Law Review, as well as a teaching assistant for both Property Law and Legal Writing courses. Mr. Andrews externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of Illinois.

A native of the Detroit area, Mr. Andrews graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications.

Mr. Andrews is licensed to practice in Illinois state courts, the United States District Court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is a Partner at EDELSON PC and the Chair of the Corporate Governance and Business Litigation Practice Group. Rafey's practice focuses upon a wide range of complex consumer class action litigation, as well as general business litigation.

On the plaintiff's side, Rafey has been appointed lead counsel in numerous class actions, including landmark settlements involving the telecom industry worth hundreds of millions of dollars. Rafey has been appointed Class Counsel in nationwide class action settlements against the major wireless carriers, aggregators, and providers of "mobile content," including *Van Dyke v. Media Breakaway, LLC*, No. 08-cv-22131 (S.D. Fla.); *Parone v. m-Qube, Inc.*, 08 CH 15834 (Cir. Ct. Cook County, Ill.); *Williams v. Motricity, Inc.*, et al., No. 09 CH 19089 (Cir. Ct. Cook County, Ill.); and *Walker v. OpenMarket, Inc., et al.*, No. 08 CH 40592 (Cir. Ct. Cook County, Ill.).

On the business side, Rafey has counseled clients ranging from "emerging technology" companies, real estate developers, hotels, insurance companies, lenders, shareholders and attorneys. He has successful litigated numerous multi-million dollar cases, including several "bet

the company" cases.

Rafey has first chaired jury and bench trials, mediations, and national and international arbitrations.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, he received a certificate in international and comparative law. Rafey received his B.A. in History, with distinction, from the University of Colorado – Boulder in 2002.

**CHRISTOPHER L. DORE** is a Partner at EDELSON PC and a member of the Technology and Fraudulent Marketing Group. Chris focuses his practice on emerging consumer technology issues, with his cases relating to online fraud, deceptive marketing, consumer privacy, negative option membership enrollment, and unsolicited text messaging. Chris is also a member of the firm's Incubation and Startup Development Group wherein he consults with emergent businesses.

Chris has been appointed class counsel in multiple class actions, including one of the largest text-spam settlements under the Telephone Consumer Protection Act, ground breaking issues in the mobile phone industry and fraudulent marketing, as well as consumer privacy. (*Pimental v. Google, Inc.*, No. 11-cv-02585 (N.D.Cal.); *Kramer v. Autobytel, Inc.* (10-cv-02722-CW); *Turner v. Storm8, LLC*, (09-cv-05234) (N.D. Cal.); Standiford v Palm, Inc. (09-cv-05719-LHK) (N.D. Cal.); and *Espinal v Burger King Corporation*, (09-20982) (S.D. Fla.)). In addition, Chris has achieved groundbreaking court decisions protecting consumer rights. Representative reported decisions include: *Claridge v. RockYou, Inc.* 785 F.Supp.2d 855 (N.D. Cal.), *Kramer v. Autobytel, Inc.*, 759 F.Supp.2d 1165 (N.D. Cal.), and *Van Tassell v. United Marketing Group, LLC*, 795 F.Supp.2d 770 (N.D.Ill.). In total, his suits have resulted in hundreds of millions of dollars to consumers.

Prior to joining Edelson, Chris worked for two large defense firms in the areas of employment and products liability. Chris graduated magna cum laude from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation and negations.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating magna cum laude from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**BENJAMIN H. RICHMAN** is a Partner at EDELSON PC and is a member of the firm's Corporate Governance and Business Litigation Practice Group. He handles plaintiff's-side consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is the director of EDELSON PC'S Summer Associate Program.

**ARI J. SCHARG** is a Partner at EDELSON PC. He handles technology-related class actions, focusing mainly on cases involving the unlawful geo-locational tracking of consumers through their mobile devices, the illegal collection, storage, and disclosure of personal information, fraudulent software products, data breaches, and text message spam. His settlements have resulted in tens of millions of dollars to consumers, as well as industry-changing injunctive relief. Ari has been appointed class counsel by state and federal courts in several nationwide class action settlements, including Webb v. Cleverbridge, et al., 11-cv-4141 (N.D. Ill.), Missaghi v. Blockbuster, 11-cv-2559 (D. Minn.), Ledet v. Ascentive, 11-cv-294 (E.D. Penn.), and Drymon v. CyberDefender, 11 CH 16779 (Cook Cnty, Illinois), and was appointed sole-lead class counsel in Loewy v. Live Nation, 11-cv-4872 (N.D. Ill.), where the court praised his work as "impressive" and noted that he "understand[s] what it means to be on a team that's working toward justice." Ari was selected as an Illinois Rising Star (2013) by Super Lawyers.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website.

Ari is very active in community groups and legal industry associations. He is a member of the Board of Directors of the Chicago Legal Clinic, an organization that provides legal services to low-income families in the Chicago area. Ari acts as Outreach Chair of the Young Adult Division of American Committee for the Shaare Zedek Medical Center in Jerusalem, and is actively involved with the Anti-Defamation League. He is also a member of the Standard Club Associates Committee.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for The John Marshall Law Review and competed nationally in trial competitions. During law school, he also served as a judicial extern to The Honorable Judge Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**STEVEN LEZELL WOODROW** is a Partner at EDELSON PC and Chair of the firm's Banking and Financial Services Practice Group. Mr. Woodrow focuses his practice on complex national class actions against some of the Country's largest financial institutions. Representative matters include cases against national banks and mortgage servicers for improper loan modification practices, unlawful home equity line of credit ("HELOC") account suspensions and reductions, and claims regarding the misapplication of payments.

Mr. Woodrow delivered the winning oral argument in *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012), the first federal appellate court decision to allow borrowers to challenge bank failures to follow the federal Home Affordable Modification Program ("HAMP") under state law.

Courts have also appointed Mr. Woodrow as class counsel in nationwide class action settlements against cellphone companies, aggregators, and mobile content providers related to unauthorized charges for ringtones and other mobile content, including *Paluzzi v. Cellco Partnership*, *Williams et. al. v. Motricity, Inc.*, and *Walker et. al. v. OpenMarket Inc.*

Mr. Woodrow has also served as an Adjunct Professor of Law at Chicago-Kent College of Law where he co-taught a seminar on class actions. Prior to joining the firm, he worked as a litigator at a Chicago boutique where he tried and arbitrated a range of consumer protection and real estate matters.

Mr. Woodrow received his J.D. High Honors, Order of the Coif, from Chicago-Kent College of Law in 2005. During law school, Mr. Woodrow served as a Notes and Comments Editor for The Chicago-Kent Law Review, competed on Moot Court, and served as President of the Student Bar Association. He additionally spent a semester as a judicial extern for the Honorable Ann C. Williams on the United States Court of Appeals for the Seventh Circuit. Steven received the ALI-ABA Scholarship and Leadership Award for best representing the combination of leadership and scholarship in his graduating class as well as the Lowell H. Jacobson Memorial Scholarship, which is awarded competitively each year to a student from one of the law schools in the Seventh Circuit to recognize personal commitment and achievement.

Mr. Woodrow is admitted to practice in Colorado (2011) and Illinois (2005).

Mr. Woodrow received his B.A. in Political Science with Distinction from the University of Michigan—Ann Arbor in 2002.

**COURTNEY BOOTH** is an Associate at EDELSON PC. Courtney focuses her practice on consumer class actions.

Courtney received her J.D., magna cum laude, from The John Marshall Law School. While in law school, she was a staff editor of The John Marshall Law Review, a teaching assistant for Legal Writing and Civil Procedure, and a member of the Moot Court Honor Society. Courtney

graduated cum laude from Virginia Tech, with a B.S. in business information technology, with a focus on computer-based decision support systems. Chandler sits on the ABA committees for Information Security and e-Discovery.

Before joining the legal profession, Chandler worked as a systems analyst. He has also interned at the Virginia Attorney General's Office as well as the U.S. Department of Justice in Washington D.C.

**ALICIA HWANG** is an Associate at EDELSON PC. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law in May 2012, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON PC, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated magna cum laude from the University of Southern California, earning her B.A. in Communication in 2007. She is a member of the Phi Beta Kappa honor society.

**NICK LARRY** is an Associate at EDELSON PC. Nick practices in the area of consumer class action and general litigation.

Nick received his J.D., cum laude, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law in 2008 and played on the school's rugby team.

**MEGAN LINDSEY** is an Associate at EDELSON PC. Megan practices in the area of consumer class action, focusing on complex class actions in the banking industry.

Prior to joining EDELSON PC, Megan worked for several years as a commercial loan underwriter and portfolio officer at Merrill Lynch, Pierce, Fenner & Smith. Megan also worked as an analyst in the troubled asset group at Bank of America, helping to monitor and restructure high-risk loans.

Megan received her J.D. from Chicago-Kent College of Law in May 2011. During law school Megan externed for the Honorable Judge Bauer in the Seventh Circuit Court of Appeals and served as Vice President-Evening Division of the Student Bar Association and Vice President of the Moot Court Honor Society. Megan also represented Chicago-Kent at the National First Amendment Moot Court Competition in Nashville, Tennessee and the National Cultural Heritage Law Moot Court Competition in Chicago, Illinois.

Megan graduated with High Honors from DePaul University in July 2005, earning her B.S. in Finance.

**DAVID I. MINDELL** is an Associate at EDELSON PC. David practices in the area of technology and privacy class actions.

David has worked on cases involving fraudulent software products, unlawful collection and retention of consumer data, and mobile-device privacy violations. David also serves as a business consultant to private companies at all stages of development, from start-up to exit.

Prior to joining EDELSON PC, David co-founded several technology companies that reached multi-million dollar valuations within 12 months of launch. David has advised or created strategic development and exit plans for a variety of other technology companies.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the preeminent cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has given speeches related to his research to a wide-range of audiences.

**AMIR MISSAGHI** is an Associate at EDELSON PC, where he focuses on technology and privacy class actions.

Amir received his J.D. from the Chicago-Kent College of Law, where he was a member of the Moot Court Honor Society and a teaching assistant in Property. Before law school, he attended the University of Minnesota, where he received his B.S. and M.S. in Applied Economics. He then began working at a Fortune 50 company as a programmer and data analyst. During that time Amir started working on his graduate studies in Applied Economics where he focused on analyzing consumer choice in healthcare markets.

**JOHN OCHOA** is an associate at EDELSON PC, focusing his practice on protecting consumers with a special emphasis on plaintiffs' privacy class action litigation, including cases brought under the Telephone Consumer Protection Act. John prosecutes cases in both state and federal courts at the trial and appellate levels.

John has secured important court decisions protecting the rights of consumers, including Elder v. Pacific Bell Telephone Co., et al., 205 Cal. App. 4th 841 (2012), where the California Court of Appeals held that consumers may pursue claims against telecommunications companies for placing unauthorized charges on consumers' telephone bills, a practice known as "cramming." John was also appointed class counsel in Lee v. Stonebridge Life Ins. Co., et al., --- F.R.D. ---, 2013 WL 542854 (N.D. Cal. Feb. 12, 2013), a case where the Defendants are alleged to have caused the transmission of unauthorized text messages to the cellular telephones of thousands of consumers.

He graduated magna cum laude from the John Marshall Law School in May, 2010 and served as Managing Editor for the John Marshall Law Review. His student Comment, which examines

bicycling and government tort immunity in Illinois, appears in Vol. 43, No. 1 of the John Marshall Law Review. While in law school, John externed with Judge Thomas Hoffman at the Illinois Court of Appeals, and competed in the ABA National Appellate Advocacy Competition.

John is active in the Illinois legal community, and serves as Co-Chair of the Membership Committee on the Young Professionals Board of Illinois Legal Aid Online (ILAO). ILAO is a non-profit organization committed to using technology to increase access to free and pro bono legal services for underserved communities throughout Illinois.

He received his B.A. with Honors in Political Science from the University of Iowa in 2004.

**ROGER PERLSTADT** is an Associate at EDELSON PC, where he concentrates on appellate and complex litigation advocacy. Roger graduated from the University of Chicago Law School, where he was a member of the University of Chicago Law Review. After law school, he served as a clerk to the Honorable Elaine E. Bucklo of the United States District Court for the Northern District of Illinois.

Prior to joining the firm, Roger spent several years at a litigation boutique in Chicago where his practice included employment and housing discrimination claims, constitutional litigation, and general commercial matters. In 2011, he was named a Rising Star by Illinois Super Lawyers Magazine.

Roger also spent time as a Visiting Assistant Professor at the University of Florida Law School where he taught Arbitration, Conflict of Laws, and Employment Discrimination, and has published articles on the Federal Arbitration Act in various law reviews.

**EVE-LYNN RAPP** is an Associate at EDELSON PC. Eve-Lynn focuses her practice in the areas of consumer and technology class action litigation.

Prior to joining EDELSON PC, Eve-Lynn was involved in numerous class action cases in the areas of consumer and securities fraud, debt collection abuses and public interest litigation. Eve-Lynn has substantial experience in both state and federal courts, including successfully briefing issues in both the United States and Illinois Supreme Courts.

Eve-Lynn received her J.D. from Loyola University of Chicago-School of Law, graduating cum laude, with a Certificate in Trial Advocacy. During law school, Eve-Lynn was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve-Lynn also clerked for both civil and criminal judges (The Honorable Judge Yvonne Lewis and Plummer Lott) in the Supreme Court of New York.

Eve-Lynn graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

**BEN THOMASSEN** is an Associate at EDELSON PC. At the firm, Ben's practice centers on the prosecution of class actions cases that address federally protected privacy rights and issues of consumer fraud—several of which have established industry-changing precedent. Among other high profile cases, Ben recently played key roles in delivering the winning oral argument before

the United States Court of Appeals for the Eleventh Circuit in *Curry v. AvMed*, 693 F.3d 1317 (11th Cir. 2012) (a data breach case that has, following the Eleventh Circuit's decision, garnered national attention both within and without the legal profession) and securing certification of a massive consumer class in *Dunstan v. comScore*, No. 11 C 5807, 2013 WL 1339262 (N.D. Ill. Apr. 2, 2013) (estimated by several sources as the largest privacy case ever certified on an adversarial basis).

Ben received his J.D., magna cum laude, from Chicago-Kent College of Law, where he also earned his certificate in Litigation and Alternative Dispute Resolution and was named Order of the Coif. At Chicago-Kent, Ben was Vice President of the Moot Court Honor Society and earned (a currently unbroken firm record of) seven CALI awards for receiving the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before settling into his legal career, Ben worked in and around the Chicago and Washington, D.C. areas in a number of capacities, including stints as a website designer/developer, a regular contributor to a monthly Capitol Hill newspaper, and a film projectionist and media technician (with many years experience) for commercial theatres, museums, and educational institutions. Ben received his Bachelor of Arts, summa cum laude, from St. Mary's College of Maryland and his Master of Arts from the University of Chicago.

**JACK YAMIN** is an Associate at EDELSON PC, where he focuses on privacy and consumer class actions.

Jack graduated cum laude from Northwestern University's Accelerated (2-year) JD Program. While in law school, Jack was a member of the Center for Wrongful Convictions, where he worked on post-conviction cases in Illinois appellate courts. Jack also served as a judicial extern to the Honorable Marvin Aspen, a senior judge of the United States District Court for the Northern District of Illinois. Throughout law school, Jack was a member of the Center for Conflict Resolution, where he mediated cases in Illinois courts throughout Chicago.

Prior to joining the firm, Jack worked as a tax consultant for business owners throughout the country, representing clients before the Internal Revenue Service, negotiating installment agreements, and handling tax audits. Jack also spent some time working at a literary agency, helping writers publish novels and marketing their work. Jack graduated summa cum laude from Binghamton University, earning his B.A. in philosophy and English literature. He is a member of the Phi Beta Kappa honor society.

**Priority Service Direct**
21520 Yorba Linda Blvd Ste G452
Yorba Linda, Ca 92887
Phone 866-534-6612

Job: 410289                    Due: Sep 16, 2014
Recipient: Avanquest North America Inc c/o Bruce Friedman
Server: David A. Pinon          Fee:

Client: Edelson PC

| | | | |
|---|---|---|---|
| Case: | 14CH14861 | Plaintiff: | QUINCEY ROBINSON, individually, and on behalf of all others similarly situated |
| Court: | Circuit Court, Cook, IL | Defendant: | AVANQUEST NORTH AMERICA INC., a California corporation, and AVANQUEST SOFTWARE S.A., a French company |
| Documents: | Summons; Complaint; Plaintiff's Motion for Memorandum in Support of Class Certification; Declaration of Benjamin H. Richman; and Preservation Letter Dated September 16,2014 | | |
| Instructions | PLEASE SERVE REGISTERED AGENT MR. BRUCE FRIEDMAN-REGISTERED AGENT*********** | | |

Company Address
4040 Lyceum Ave, Los Angeles, Ca 90066

Avanquest North America Inc c/o Bruce Friedman

Date & Time:                    Description of Service / Recipient:

Age: _____ Ethnicity: _____ Gender: _____ Weight: _____
Height: _____ Hair: _____ Eyes: _____ Relationship: _____

**Edelson PC**

350 North LaSalle Street, Suite 1300, Chicago, Illinois 60654
t 312.589.6370 f 312.589.6378

www.edelson.com

September 16, 2014

<span style="text-decoration: line-through">VIA PROCESS SERVER</span>

Mr. Bruce Friedman
4040 Lyceum Avenue
Los Angeles, California 90066

Re:     *Robinson v. Avanquest N. Am. Inc., et al.*, No. 14 CH 14861 (Cir. Ct. Cook Cnty., Ill.)
        Preservation, Discovery, and Production

Dear Bruce:

        I write to provide notice to Avanquest North America Inc. and Avanquest Software S.A. of their instant and continuing duty to preserve all documents, records, data, information, and other tangible evidence that are relevant to or which may lead to the discovery of information relevant to the subject matter of the above-referenced lawsuit. This duty applies to this case as well as to all existing or future additional related actions that may be commenced, and extends to Avanquest North America Inc. and Avanquest Software S.A., as well as their agents, affiliates, independent contractors, and others acting on their behalf (collectively, "Avanquest"), to the extent those individuals or entities have any such information within their possession, custody or control.

        In particular, Plaintiff intends to seek the production of relevant, non-privileged information, including documents, correspondence, source code, and other electronically stored information ("ESI") relating to Avanquest's Fix-It Utilities Professional software and its marketing of the same. Plaintiff intends to seek the above-described information in its native electronic format. Thus, absent agreement by the Parties, copying, preserving, or otherwise converting any digital evidence or information to .tiff files or other non-native formats will *not* be considered compliant with this notice, irrespective of whether such production is made in connection with Plaintiff's anticipated written discovery requests.[1]

        Additionally, Avanquest has a continuing duty to suspend all routine data retention policies and other processes or practices to the extent they involve the destruction of any evidence that is or is likely to be considered relevant in this matter, and should have already done so. We also remind Avanquest of its continuing obligation to preserve evidence that may come into existence after the date of this letter, or which may exist now or in the future, but of which it has no current knowledge.

---

[1]     To be clear, we're willing to discuss (and receive) alternative forms of production for the sake of efficiency. Nevertheless, Avanquest should preserve all relevant and discoverable information and documents in their native data format in the event that production in that form is ultimately necessary. Regardless of form, Plaintiff reserves the right to seek the production of discoverable information in its native format.

Finally and in light of the foregoing, we propose that the Parties schedule a conference between counsel and any other necessary persons to address the nature and context of ESI discovery in this matter. In an effort to facilitate the Parties' discussions, we may have present and participating at any such conference our technology expert(s) and propose that Avanquest does the same. During the conference, we intend to discuss the nature, form, and format for the production of ESI by Avanquest in its responses to Plaintiff's anticipated written discovery requests. Our objective in proceeding in this manner is to reach agreement on a stipulated ESI discovery protocol, which will minimize the potential for misinterpretation of discovery requests, deficient discovery responses and discovery-related motion practice. At the conference and in addition to the issues outlined above, we intend to raise and will be prepared to discuss the following non-exhaustive list of topics:

a.   Agreement as to general discovery-related definitions to be used by the Parties;

b.   Identification of individuals, including any non-party or third-party individuals, who can testify to ESI-related issues, including network and computing infrastructure, electronic records management and retention, and sources of potentially relevant ESI;

c.   Identification of all data storage, whether connected or not connected to Avanquest's network mapping that may be a source of relevant ESI;

d.   Avanquest's policies for managing the system(s) that generate and store ESI. Examples include, but are not limited to, back-up and business continuity policies, data retention policies, as well as internally and externally prepared audit reports documenting adherence to these policies;

e.   The necessity for restoration of previously deleted data and information;

f.   Determining whether back-up and archive information is within the scope of discovery;

g.   Avanquest's data protection policies and methodologies, such as continuous data protection, database snapshot or other rollback technologies;

h.   Existing and continuing necessity for ESI preservation;

i.   Existing and future necessity for forensic evidence collection, preservation orders, and other extraordinary ESI preservation activities;

j.   ESI search terms, search protocols, sampling, and error testing;

k.   Nature, form, and format of ESI production;

l.   Production (where applicable) of structured data, including search queries;

m.     Nature, form, and format of initial disclosures of ESI;

n.     Description of the processes of production;

o.     Production schedule and costs;

p.     Privilege log format, timing, and privileged document metadata; and

q.     Documenting efforts to reach an accord regarding ESI and general discovery disputes.

Of course, if there are any additional discovery-related matters you would like to discuss, we would certainly be willing to do so. If, however, you are unwilling to engage in such discussions or otherwise disagree with this proposal, please let us know as soon as possible, so that we may bring the Parties' respective positions to the attention of the Court at the appropriate time. If you are willing to engage in the discussions outlined above, please let me know when you and your technology expert(s) (if any) are available to do so.

We look forward to working with you to expedite the discovery process in this matter and more generally.

Very truly yours,

EDELSON PC

Benjamin H. Richman