**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

QUINCEY ROBINSON, individually and on
behalf of all others similarly situated,

        Plaintiff,

   v.

AVANQUEST NORTH AMERICA INC., a
California corporation, and AVANQUEST
SOFTWARE S.A., a French company,

        Defendants.

Case No.  14-cv-08015

---

## AVANQUEST NORTH AMERICA INC.'S OPPOSITION TO QUINCEY ROBINSON'S MOTION TO REMAND LAWSUIT TO STATE COURT

---

I.    **INTRODUCTION**

Avanquest North America Inc. ("Avanquest") removed this case to federal court based on diversity jurisdiction, 28 U.S.C. §1332(a)(1), as well as under the Class Action Fairness Act ("CAFA"), §1332 (d)(2), as clearly stated in its notice of removal. Removal of this case to this federal court was and is proper.

To remove a lawsuit pursuant to §1332(a)(1) complete diversity must exist and the amount in controversy must exceed $75,000. In this case, it is undisputed that there is complete diversity of citizenship. Plaintiff, Quincey Robinson's ("Robinson") motion to remand is based on an assumption that the $75,000 amount in controversy cannot be met, and that Avanquest failed to remove this case under CAFA. Both assumptions are incorrect.

In ascertaining whether the amount in controversy is reached, one looks at the damages prayed for in the Class Action Complaint and Demand for Jury Trial ("Complaint"). In this case, when one considers all of the damages requested by Robinson, including injunctive relief, punitive damages, and attorneys' fees, the amount in controversy far exceeds the $75,000 diversity jurisdictional minimum amount under 28 U.S.C. § 1332(a). It is noteworthy that in the motion to remand Robinson fails to mention his request for injunctive relief. The word injunction is absent from the remand papers because the costs alone of implementing Robinson's requested injunctive relief alone would far exceed the diversity jurisdictional minimum in that it requires Avanquest to make changes to its nationally sold Fix-It Utilities Professional ("Fix-It") software program's source code, product packaging, and Avanquest's website. Additionally, the attorneys' fees requested as part of the Illinois Consumer Fraud and Deceptive Business Practice Act cause of action, plus compensatory and punitive damages, will far exceed the $75,000 jurisdictional minimum. Finally, this lawsuit was properly removed under CAFA because aggregation of the class's potential damages is permitted and exceeds the $5 million

jurisdictional minimum under 28 U.S.C. § 1332(d)(2). In sum, this lawsuit was properly

removed by Avanquest. Accordingly, Robinson's motion for remand and request for attorneys'

fees should be summarily denied.

## II.     PROCEDURAL HISTORY

Robinson's Complaint was initially brought in the Circuit Court of Cook County, Illinois.

It asserts putative class action claims against defendants Avanquest and Avanquest Software

S.A. (Request for Judicial Notice In Support of Opposition to Motion to Remand ("RJN"), Ex. 1

[Complaint].)On October 15, 2014, Avanquest removed this action pursuant to 28 U.S.C. §§

1332, 1441(a) – (c), 1446, and 1453(b).[1] (RJN, Ex. 2 [Ntc. of Removal].)

On October 22, 2014, Avanquest filed motions to dismiss, to transfer venue, and to

compel arbitration.[2] (RJN, Ex. 3-5 [Dkt. Nos. 12-14].) All three motions were set for

presentment on October 30, 2014. On November 3, 2014, Robinson filed the instant motion to

remand and request for attorneys' fees. (RJN, Ex. 6 [Dkt. No. 21].) Both the motion and request

for fees must be denied because damages far exceed the $75,000 minimum amount in

controversy for diversity jurisdiction and jurisdiction is also proper pursuant to CAFA.

## III.    STATEMENT OF FACTS

### A.     The Parties and the Dispute.

Avanquest is a California corporation with its headquarters and principal place of

---

[1] Avanquest Software S.A. has not yet been served with summons and process, discovery has not yet begun, and the initial case management conference has not occurred. (Affidavit of N. Kathleen Strickland in Support of Opposition to Motion to Remand ("Strickland Aff."), ¶ 3.)

[2] On page 2 of its papers, Robinson argues that Avanquest "improperly 'multiplied the proceedings'" by filing its motion to dismiss, motion to transfer venue, and motion to compel arbitration on the date its responsive pleading was due, and implies Avanquest ignored Robinson's October 21, 2014, letter demanding remand of this lawsuit. Robinson's counsel fails to advise the court that the day Avanquest filed those motions, October 22, 2014, was the deadline to respond to the Complaint and on that same day Avanquest responded to Robinson's letter with case authority detailing why removal was proper. (*Id.* at ¶ 8, Ex. 2.)

business in Calabasas, California. (Complaint, ¶ 6; Strickland Aff., ¶ 4, Ex. 1.)[3] Avanquest

Software S.A. is a French company with its headquarters and principal place of business in

France. (*Id.* at ¶ 7.) Robinson is a resident of the State of Illinois. (*Id.* at ¶5.) It is undisputed

that there is complete diversity of citizenship.

Robinson alleges that in late 2013 he "visited his local office supply store to search for

software that would increase the speed, performance, and stability of his" computer, saw Fix-It,

"read Avanquest's representations about the software's utility located on its box and packaging

materials," and relying on those representations he "purchased Avanquest's Fix-It Utilities 14

Professional." (Complaint, ¶¶ 35-36.) He further alleges that he installed and ran Fix-It on his

computer, but that "Fix-It . . . did not – and could not – perform as advertised . . . ." (*Id.* at ¶¶

37-38, 61.) Though the proposed class, as defined by Robinson, is limited to Illinois residents,

Robinson admits Fix-It is sold nationally at retail outlets (i.e., Wal-Mart, Best Buy, Target, *etc.*)

and online through Avanquest and other online retailers. (*Id.* at ¶¶ 2, 11 39; Affidavit of Kevin

Bromber in Opposition to Motion to Remand ("Bromber Aff."), ¶ 3.)

Robinson brings a putative class action on behalf of himself and a class defined as "All

residents of the State of Illinois who purchased Avanquest's Fix-It Utilities Professional

---

[3] Evidence offered in opposition to a motion to remand can be construed as an amendment to the notice of removal. *Cain v. Hartford Life and Acc. Ins. Co.,* 890 F. Supp. 2d 1246, 1249 (C.D. Cal. 2012) (citing *Cohn v. Petsmart, Inc.,* 281 F.3d 837, 840 n. 1 (9th Cir., 2002)); *see also Willingham v. Morgan,* 395 U.S. 402, 405 n. 3, 89 S.Ct. 1813 (1969) ("it is proper to treat the removal petition as if it had been amended to include the relevant information contained in the later-filed affidavits"). Leave to amend a notice of removal is permissible so long as the notice is curable. *Int'l Gateway Commc'ns, Inc. v. Commc'n Telesystems Int'l, Inc.,* 922 F. Supp. 122, 124 (N.D. Ill. 1996) ("In cases where the notice of removal contains procedural defects, the issue for the court is whether the notice was so defective as to be incurable.") Avanquest's notice of removal sets forth sufficient grounds for removal of this matter, but in the event the Court believes there are defects, the evidence provided by Avanquest herein establishes that any defects are cured. In the event this Court is inclined to grant the motion for remand Avanquest requests leave to amend the notice of removal.

software." (Complaint, ¶ 39.)  Now, in seeking to avoid federal CAFA jurisdiction, Robinson's

remand motion asserts the putative class relates to **one** version of Fix-It – this is not true.

Nowhere in the Complaint is there any reference to limiting the requested class to only one

version of Fix-It.[4]  Courts will not permit post-removal changes of facts in an attempt to prevail

on a motion for remand.  See *St. Paul Mercury Indemnity Co. v. Red Cab. Co*., 303 U.S. 283,

292-93, 58 S.Ct. 586 (1938); *Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1032-33 (N.D. Ca.

2002).

Avanquest removed this lawsuit on two grounds:  CAFA and diversity jurisdiction.  Also,

in correspondence sent to Robinson's counsel both attorneys' fees and injunctive relief are

mentioned as bases for arriving at the §1332(a) $75,000 amount in controversy for removal.  In

the damages requested, Robinson seeks attorneys' fees, injunctive relief and punitive damages.

(Complaint, ¶ 63, p. 22-23 [Prayer for Relief C, F, H].)

**B.      Avanquest's End User License Agreement.**

When Fix-It is purchased in a retail store it comes in a box, as shown in figure 6 of the

Complaint, which contains three items: (1) the Fix-It Utilities User's Guide ("User's Guide"); (2)

a single disk labeled Fix-It Utilities Professional Bootable Rescue Disk ("Fix-It Disk"); and (3) a

Fix-It Utilities Pro registration card.  (Bromber Aff., ¶ 4.)  In order to install and run Fix-It on his

computer Robinson had to insert the Fix-It Disk into his computer.  (*Id*. at ¶ 6.)  When a user

attempts to install Fix-It on his or her computer, the first screen that appears displays a dialogue

box of the Fix-It set-up *wizard*.  (*Id*.)  When the user clicks the "Next" button in the Fix-It set-up

*wizard* dialogue box, a second dialogue box appears that displays Avanquest's End User License

Agreement ("EULA") and prompts the user to review the EULA and click an "Accept" button to

assent to the terms of the EULA.  The "Accept" button appears below a window containing the

---

[4] The first paragraph of the Complaint defines "Fix-It Utilities" as one version, Version 14.

entire EULA. (*Id.*) The user cannot begin the installation process unless he or she agrees to the terms of the EULA by clicking this "Accept" button. (*Id.*)[5]

Robinson's acceptance of the EULA's terms is evidenced by his assessment of Fix-It's performance and his admission that he "continued to use the software" despite its alleged deficiencies. (Complaint, ¶¶ 37-38, 61.) Robinson could not have assessed Fix-It's performance unless he installed Fix-It on his computer, and he could not install Fix-It unless he clicked "Accept" to the terms of the EULA. (Bromber Aff., ¶ 6.) Robinson accepted the terms of the EULA, which contains a class action waiver clause and a California choice of law clause. (*Id.* at ¶ 13, Ex. 2.) Both clauses are relevant to the calculation of the "amount in controversy" here.

## IV. LEGAL ARGUMENT

### A. Removal Was Proper Under 28 U.S.C. § 1332(a) – Diversity Jurisdiction.

#### 1. It Would Cost Avanquest Far More than $75,000 to Comply with the Injunctive Relief Demanded.

When a plaintiff demands injunctive relief, "the minimum amount in controversy [is] present if the injunction sought by the plaintiffs would require some alteration in the defendant's method of doing business that would cost the defendant at least the statutory minimum amount." *In re Brand Name Prescription Drugs Antitrust Litig.* (*"In re Brand Name"*), 123 F.3d 599, 609 (7th Cir. 1997); *Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*, 309 F.3d 978, 983 (7th Cir. 2002) ("the cost to a defendant of complying with an injunction sought by the plaintiff may properly be considered in determining the amount in controversy"). In this case, Robinson seeks injunctive relief, requesting the Court enter "an order (i) prohibiting Avanquest from engaging in the wrongful and unlawful acts described herein, (ii) *requiring Avanquest to disclose* and admit

---

[5] An identical copy of the EULA is also in the very front of the paper version of the User's Guide found within the Fix-It packaging; a user that purchases Fix-It from a retail store, like Robinson, could reference that paper version of the User's Guide (and EULA). (Bromber Aff., ¶¶ 4-5.)

the wrongful and unlawful acts described herein, and (iii) *requiring Avanquest to fully disclose the true nature of its software products in the future*." (Complaint, p. 22 [Prayer for Relief] (emphasis added).) Therefore, the costs Avanquest will incur to comply with Robinson's injunctive relief demands are to be calculated for the amount in controversy.

In the Complaint, Robinson's counsel discusses certain other software cases of Avanquest's alleged competitors and the results of those cases. (*Id.* at ¶ 34.) In discussing those results, Robinson's counsel stated that the relief obtained in those cases included "industry-changing modifications to the software products at issue - making their detection, reporting and repairing mechanisms far more transparent and more accurate when it comes to informing consumers of threats posed by existing errors on their computers." (Complaint, ¶ 34.) In those settlements, as part of the primary purpose of the litigation, Robinson's counsel sought and obtained injunctive relief that required the other utility software makers to modify their respective software program and/or the software's terms and packaging.[6] (RJN, Ex. 7 - 13.) Avanquest's Fix-It is a fully functioning, software utility product that performs as advertised, unlike those at issue in the other cases filed by Robinson's counsel.

---

[6] *Ledet v. Ascentive LLC*, Case No. 2:11-cv-00294-PBT (E.D. Pa. 2011) (required changes to be made to the software's purchase agreement within thirty days of final judgment order); *Thurman, et al. v. Cyberdefender Corp.*, No. 11-CH-16779 (Cir. Ct. Cook County, Ill. 2011) (required changes to be made to the defendant' website, the software program, and documentation explaining the software's functions within fourteen days of final judgment order); *Webb, et al. v. Cleverbridge, Inc., et al.*, Case No. 1:11-cv-04141-JHL (N.D. Ill. 2012) (required changes to be made to the software's website and end user license agreement within fourteen days after last day to appeal or final adjudication of any appeal); *Gross v. Symantec Corp.*, Case No. 3:12-cv-00154-CRB (N.D. Cal. 2014) (required changes to be made to the software program and documentation explaining the software's functions within ninety days after last day to appeal or final adjudication of any appeal); *Lagarde v. Support.com Inc.*, Case No. 3:12-cv-00609-JSC (N.D. Cal. 2013) (required changes to be made to the software and documentation explaining the software's functions within fourteen days after last day to appeal or final adjudication of any appeal); *Kulesa v. PC Cleaner, Inc.*, Case No. 8:12-cv-00725-FMO (C.D. Cal. 2014) (required changes to be made to the software program within ninety days after last day to appeal or final adjudication of any appeal).

It is apparent that through the injunctive relief sought herein, Robinson desires Avanquest to make similar changes to Fix-It, both to the software source code as well as to the packaging, and apply those changes to the current version of Fix-It sold both at retail outlets and online. (*See* Complaint, ¶ 34.)  Compliance with Robinson's prayer for injunctive relief would necessarily include changes to Fix-It's packaging (to provide the requested "full disclosure in the future"), Avanquest's website, and the software source code itself—all of which should be considered in determining the amount in controversy.  (Bromber Aff., ¶ 10.)

Robinson may argue the compliance costs of requested injunctive relief must be divided pro-rata amongst class members when calculating the amount in controversy, but the "non-aggregation" rule[7] does not apply here.  This is because if injunctive relief demanded by a plaintiff cannot be implemented on an individual basis and instead requires "undertaking a system change" (which is clearly the case here) the total cost for instituting the change counts toward the amount in controversy.  *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006).  In *Snyfuel*, a putative class action, the defendant was alleged to have charged the default rate for shipping a package when the weight of the package was not identified by the customer.  *Id.* at 648.  Plaintiff demanded injunctive relief requesting defendant to change its method of business to reduce the incidence of default charges.  *Id.* at 651.  In order to meet the plaintiff's injunctive relief demands by reducing the incidence of default charges, the defendant had to implement a system of company-wide training.  *Id.* at 651-52.

> [t]he key jurisdictional issue in this case, is whether Airborne could alter the default weight billing practice for an individual customer – in which case the value of the injunction to each individual class member is quantifiable and presumably quite small – or if it could

---

[7] The non-aggregation rule, which does not apply to CAFA, is that claims of multiple litigants cannot be aggregated to reach the jurisdictional amount in controversy. *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 717-18 (7th Cir. 2012).

> comply with the proposed injunction only by undertaking a
> systemic change of its weighing and billing procedures, a change
> that would cost the same whether it was made for just one customer
> or every customer served by the company. *Id.*, at 652.

Because a systemic change was required, the total cost of compliance – $30 million over

four years – was assessed when determining the amount in controversy for the one named

representative plaintiff, and the Seventh Circuit found the amount in controversy requirement

satisfied. *Id.* at 650-652; *see also, Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 898

(2006) (finding the reasoning of the 7th Circuit in *In re Brand Name* persuasive and consistent

with its prior court rulings, the court found that the minimum amount in controversy was

satisfied because the "cost of compliance running to any [individual] [p]laintiff or putative class

member would exceed $75,000 because the requested relief would *require it to make significant*

*changes to its business practices by developing a new system* for adjusting and paying

diminished value claims and providing extensive notice in Colorado") (emphasis added).

Avanquest sells its Fix-It program nationally. (Bromber Aff., ¶ 3.) Avanquest creates

one package of Fix-It for its retail distributors and ships the product to those distributors for their

nationwide distribution.[8] (*Id.*) Accordingly, if Avanquest were to implement Robinson's

requested injunctive relief, then like the defendants in *Synfuel* and *Lovell*, it would have to make

those changes on a systemic, nationwide basis – it could not just implement changes to the Fix-It

program sold within Illinois. (*Id.* at ¶ 10.) Avanquest would have to pull all of its existing stock

of the current version of Fix-It from stores and distribution centers across the USA ("In Channel

Inventory") and thereafter replace it with a new version of the product containing the requested

---

[8] Although certain large retailers have different packaging based on the retailer's different
requirements, Fix-It is produced to those retailer's standards for nationwide distribution and not
on a state-by-state basis. (Bromber Aff., ¶ 3.)

RC1/7679188.10/JZ4

changes.[9]  (*Id.*)  The cost incurred by Avanquest to produce its current In Channel Inventory is

$127,978.19.  (*Id.*)  The cost to recall and replace that inventory would be a minimum of

$127,978.19.  (*Id.*)  This amount does not include any costs associated with making the requested

changes to Avanquest's website or Fix-It's source code.  Further, based on current shipping

agreements, it would cost Avanquest $8,700.12 to re-ship to its distributors the same number of

In Channel Inventory Fix-It units conforming to Robinson's demands.  (*Id.*)

In addition to In Channel Inventory, Avanquest has finished packaged units of Fix-It in

its warehouse that cost Avanquest $25,963 to produce.  (*Id.*)  Because all of the In Channel

Inventory and finished goods inventory would have to be replaced with new units of Fix-It

conforming to Robinson's demands, Avanquest would have to expend $162,641.40 (plus website

or source code changes) to implement Robinson's requested injunctive relief.  Accordingly, the

entire cost for meeting the injunctive relief demanded, well over $162,000, can be included in the

calculation of the amount placed at issue by Robinson's individual claims without improperly

aggregating the cost, and clearly exceeds amount in controversy for diversity jurisdiction.

**2.      Robinson's Attorneys' Fees Satisfy the
$75,000 Amount in Controversy Requirement.**

**a.      Attorneys' Fees Count Towards the Amount in Controversy.**

When determining the amount in controversy for purposes of diversity jurisdiction,

attorneys' fees are included if a specific statute authorizes the award of attorneys' fees or if they

are sought as part of the underlying claim.  *Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d

1004, 1010 (N.D. Cal. 2002); *Galt G/S v. JSS Scandinavia*, 142 F. 3d 1150, 1155-56 (9th Cir.

---

[9] Fix-It Version 15 was released in late fall of 2013 and all Fix-It Version 14 inventory was depleted by February 17, 2014.  (Bromber Aff., ¶ 11.)  When a new version of Fix-It is released, the existing In Channel Inventory for the prior version is depleted and restocked with the newly released version, and the prior version is no longer produced.  Thus, any changes to Fix-It would have to be to Fix-It Version 15.  (*Id.*)

1998); *El v. AmeriCredit Financial Services, Inc.*, 710 F. 3d 748, 753 (7th Cir. 2013); *Gardynski-Leschuck v. Ford Motor Co.*, 142 F. 3d 955, 958 (7th Cir. 1998). Robinson's first Cause of Action for violation of the Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/1, *et seq.* (Complaint, ¶¶ 44- 53), authorizes an award of attorneys' fees (distinct from costs, which may also be awarded) to the prevailing party. 815 ULCS 505/10a. Thus, the attorneys' fees sought by Robinson may be included in calculating the amount in controversy.

### b. Robinson's Attorneys' Fees Need Not be Allocated Amongst the Putative Class Members.

As discussed above, Robinson accepted the terms of the Fix-It EULA because he admits he ran Fix-It on his computer (Complaint, ¶¶ 37-38, 61), and Fix-It cannot be run on a computer unless the user has clicked "Accept" to the terms of the EULA. (Bromber Aff., ¶ 6.) The process of clicking and accepting the terms of the EULA prior to installation and use of Fix-It creates what is referred to as a "clickwrap" agreement. A clickwrap agreement "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon." *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *5 (N.D. Cal. June 25, 2014). Contracts formed through clickwrap agreements are routinely enforced. *See, Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (approving a clickwrap arbitration agreement because "plaintiff was provided with notice and an opportunity to review terms of service prior to acceptance").

The EULA contains a class action waiver clause providing that "[n]either you, nor any other user of [Fix-It] can be a class representative, class member, or otherwise participate in a class, consolidated, or representative proceeding without having complied with the opt-out requirements above." (Bromber Aff., ¶ 8, Ex. 2.) Robinson never exercised his right to opt-out of the class action waiver (*Id*. at ¶ 9), which means this lawsuit cannot be maintained as a class

action and all attorneys' fees incurred prosecuting this action are attributable to Robinson alone.

          c.       **Incurred and Reasonably Expected
Attorneys' Fees Amount to Over $75,000.**

          (1)       **Pre-removal attorneys' fees are included in calculation.**

In the Seventh Circuit, attorneys' fees incurred up to the time of removal are included in the amount in controversy. *ABM Sec. Servs., Inc. v. Davis*, 646 F.3d 475, 479 (7th Cir. 2011). On September 15, 2014, one month prior to the removal of this lawsuit, Robinson's counsel declared they have "dedicated substantial resources to the investigation of the claims at issue in this action, and will continue to do so throughout its pendency." (Dkt. No. 1-1, p. 37, ¶ 4 [Richman Decl. ISO Class Cert.].)  In a similar lawsuit recently settled by Robinson's counsel with a different utility software company, Robinson's counsel stated their hourly rates are $570 for lead counsel, $450 for second chair partner, and $335 for a second year associate.  (RJN, Ex. 13, p. 46.)  Although it is not currently known how many hours Robinson's counsel has expended in this case, it is reasonable to assume that approximately one hundred and fifty hours were expended to meet with Robinson, investigate his claims, evaluate and conduct legal research to assess the viability of the causes of action to be brought, draft each of the complaint, motion for class certification and preservation, discovery, and production letter, effect service of process on all defendants, and begin preparing for discovery.  At a blended rate of $500 per hour, Robinson's counsel's pre-removal attorneys' fees alone are likely in the range of $75,000.[10]

---

[10] In a similar utility software class action brought by Robinson's counsel, *Thurman, supra*, No. 11-CH-16779, four months after the complaint was filed the parties entered into a stipulated settlement for $9,750,000 and an attorneys' fee award of $1,625,000.  (RJN, Ex. 8, pp. 12-13.) That attorney fee award pro-rated on a monthly basis comes to $406,250 in attorney's fees per month, which is far in excess of the $75,000 diversity jurisdictional amount in controversy. Interestingly, in another utility software case filed by Edelson PC in the Northern District of Illinois, no remand was sought.  *See, Machowicz v. Kaspersky Lab, Inc.*, No. 14 C 1394, 2014 WL 4683258, at *1 (N.D. Ill. Sept. 19, 2014).

### (2) Ninth Circuit law includes attorneys' fees for life of case in the amount in controversy calculation.

Under Ninth Circuit law not only are attorneys' fees incurred up to the date of removal calculated in determining the amount in controversy, but also future attorneys' fees.[11]  *See*, *Brady v. Mercedes-Benz USA, Inc*., 243 F. Supp. 2d 1004, 1010-11 (N.D. Cal. 2002) (agreeing with the many courts that "have held that a reasonable estimate of fees likely to be recovered may be used in calculating the amount in controversy"); *Cain, supra*, 890 F. Supp. 2d at 1250) ("When assessing the amount in controversy, the court considers the amount of attorneys' fees to be accrued throughout the entirety of the litigation");[12] *Feller v. Hartford Life & Acc. Ins. Co*., 817 F. Supp. 2d 1097, 1107 (S.D. Iowa 2010) ("it is rational to include the future legal expenses in calculating the amount in controversy").  The measure of future attorneys' fees included in the amount in controversy is "the amount that can reasonably be anticipated at the time of removal, not merely those already incurred."  *Simmons, supra*, 209 F. Supp. 2d at 1035.

In a recent lawsuit filed by Robinson's counsel regarding utility software, counsel stated they spent 1,406.8 hours for a total of $616,703.00 in attorneys' fees.  (RJN, Ex. 13, p. 46.)  In other similar lawsuits filed by Robinson's counsel, attorneys' fees in excess of $500,000 were

---

[11] Ninth Circuit law is relevant here because the EULA includes a forum selection and choice of law clause:  "This EULA is subject to and will be *governed by and construed in accordance with the substantive laws in force of the State of California* . . . Any action arising under, relating to or connected with this EULA or the use of the Licensed Software will be *filed only in an appropriate court located in Los Angeles County, California*."  (Bromber Aff., ¶ 7, Ex. 2, emphasis added.)  Because Robinson was required to file this lawsuit in California – to the extent any lawsuit could be filed given the arbitration clause – and California law governs, it is Ninth Circuit authority that should govern issues of remand and the amount in controversy.

[12] The court in *Cain* further stated that a district court can use its discretion to determine, within its own experience, that an award of attorneys' fees alone will satisfy the amount in controversy requirement. *Cain, supra*, 817 F. Supp. 2d at 1250. "Hartford has shown that as of April 2007, Cain's primary attorney, Mr. Harrow, was charging $425 per hour.  Considering that hourly rate, plus the hourly rates of associates working with Mr. Harrow, the Court finds in its discretion that Cain's attorney fee claims could exceed the $75,000 jurisdictional limit." *Id.*

requested and received in settlement.[13]  Thus, it is objectively reasonable that Robinson's

counsel in this case will incur attorneys' fees of at least $500,000, far in excess of the $75,000

amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332(a).

**B.     Removal Was Proper Under 28 U.S.C. § 1332(d) – CAFA.**

A district court has original jurisdiction under CAFA over a class action where the

aggregated amount in controversy, *i.e.*, the total value of all class members' individual claims

added together, exclusive of costs and interest, exceeds the $5 million jurisdictional minimum.

28 U.S.C. § 1332(d)(2); *Keeling v. Esurance Ins. Co.*, 660 F.3d 273, 274 (7th Cir. 2011) (In an

insurance fraud class action, the Seventh Circuit aggregated the total cost of premiums charged

to automobile insurance customers to ascertain the compensatory damages sought, and added the

potential punitive and injunctive relief damages to determine that CAFA's $5 million minimum

amount in controversy was exceeded.); *Watkins v. Vital Pharmaceuticals, Inc.* 720 F.3d 1179,

1181-82 (9th Cir. 2013) (In reversing an order remanding a class action to state court, the court

looked at the aggregate amount of damages at issue and found, based on plaintiff's claims for

restitution, disgorgement of profits, and attorneys' fees, the $5 million minimum amount in

controversy for CAFA jurisdiction was established.)  Robinson's class definition is not restricted

to only Fix-It Version 14, rather it includes <u>all</u> versions of Fix-It.  (Complaint, ¶ 39 ("All

residents of the State of Illinois who purchased Avanquest's *Fix-It Utilities Professional*

*software*.").)  Accordingly, the alleged damages of all Illinois purchasers of any version of Fix-It

---

[13] *Ledet, supra*, Case No. 2:11-cv-00294-PBT ($1,075,000 in attorneys' fees and costs requested
and awarded); *Webb, supra*, Case No. 1:11-cv-04141-JHL ($1,200,000 in attorneys' fees and
costs requested and awarded); *Gross, supra*, Case No. 3:12-cv-00154-CRB ($700,000 in
attorneys' fees requested and awarded); *Lagarde, supra*, Case No. 3:12-cv-00609-JSC ($900,000
in attorneys' fees and costs requested, with $677,860 awarded); *Theis v. AVG Technologies CZ,
S.R.O.*, Case No. 1:12-cv-10920-RGS (D. Mass. 2014) ($750,000 in attorneys' fees and costs
requested, with $616,703 awarded).  Fix-It is a legitimate utility product that performs in the
manner a reasonable consumer would expect, unlike those at issue in these cases.

(within the statute of limitations time period) are aggregated to determine the amount in controversy. In *Watkins supra*, the court found CAFA jurisdiction existed based on a declaration submitted by the defendant stating that nationwide sales of the product for the last four years exceeded $5 million. *Watkins, supra*, 720 F.3d at 1181-82.

The population of the United States is approximately 308,745,538 and the population of Illinois is 12,830,632. (RJN, Ex. 14-15 [http://www.census.gov/2010census/data/ (last visited Nov. 20, 2014)]). Illinois accounts for approximately 4.16% of the population of the United States. The national sales for Fix-It for 2010-2014, which encompasses the four year statute of limitations for breach of contract for the sale of goods (810 Ill. Comp. Stat. Ann. 5/2-725; Cal. Civ. Code § 337), totals 470,273. (Bromber Aff., ¶ 12.) Using the population of Illinois as a representative indicator of how many units of Fix-It were sold in Illinois, 4.16% of 470,273 means that 19,543 units of Fix-It were sold in Illinois. At a cost of $39.95 per unit of Fix-It, the total compensatory damages for the putative class would be $780,754. Plaintiff seeks punitive damages here,[14] and even a multiplier of 6 would result in $5,465,278 in compensatory and punitive damages at issue. Thus, the amount in controversy exceeds the $5 million CAFA jurisdictional minimum, based on compensatory and punitive damages alone.

## C. Because Removal Was Proper No Attorneys' Fees Should Be Awarded

Removal was proper based on the requested relief sought by Robinson. The removal papers clearly stated all bases upon which removal was sought. Additionally, Ms. Strickland's October 22, 2014, letter enumerated Avanquest's bases for removal. That letter was sent immediately after the required responsive pleading was filed in District Court - a time deadline

---

[14] Punitive damages may be aggregated and included in the amount in controversy under CAFA. *W.C. Motor Co. v. Talley*, No. 12 C 2307, 2014 WL 3882489, at *4 (N.D. Ill. Aug. 7, 2014). The Seventh Circuit has recognized that ten is the outer limit multiplier for punitive damages under the due process clause of the Constitution, as understood by *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). *W.C. Motors, supra*, at * 4.

counsel was required to meet regardless of Robinson's counsel's correspondence from the preceding day. Because the authorities cited herein demonstrate that removal was objectively reasonable and proper, counsel's request for attorneys' fees must be denied.[15]

## V.    CONCLUSION

Based on the foregoing, Avanquest respectfully requests this Court to deny Robinson's motion to remand this lawsuit to state court and deny the request for attorneys' fees.

Respectfully submitted,

/s/ Natalie M. Limber
One of the Attorneys for
Avanquest North America Inc.

Natalie M. Limber
TRAUB LIEBERMAN STRAUS & SHREWSBERRY, LLP
303 West Madison, Suite 1200
Chicago, IL 60606
(312) 332-3900
(312) 332-3908 – FAX
Firm No. 44920

KATHLEEN N. STRICKLAND (Admitted *Pro Hac Vice*)
DEVIN C. COURTEAU (Admitted *Pro Hac Vice*)
ROPERS, MAJESKI, KOHN & BENTLEY
150 Spear Street, Suite 850
San Francisco, CA 94105
Office: (415) 543-4800
Facsimile: (415) 972-6301

---

[15] The imposition of attorneys' fees under 28 U.S.C. § 1447(c) turns on the reasonableness of the removal and is only warranted when the removing party lacked an objectively reasonable basis for seeking removal. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141, 126 S.Ct. 704 (2005) ("Absent unusual circumstances, courts may award attorneys' fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied"); *Lott v. Pfizer, Inc.*, 492 F.3d 789, 792 (7th Cir. 2007). As set forth above, there was an objectively reasonable basis to believe that the costs of injunctive relief, attorneys' fees, and punitive damages sought in this lawsuit exceed the statutory minimum of $75,000, exclusive of interest and costs, for diversity jurisdiction, and $5 million for CAFA jurisdiction at the time of removal.

RC1/7679188.10/JZ4

## CERTIFICATE OF SERVICE

I, Natalie M. Limber, an attorney, hereby certify that on November 24, 2014, I caused a true and correct copy of this Opposition to Motion to Remand to be electronically filed with the Court using the CM/ECF system, and the following counsel of records were served:

Jay Edelson
Rafey S. Balabanian
Benjamin H. Richman
Courtney Booth
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
jedelson@kamberedelson.com
rbalabanian@edelson.com
brichman@edelson.com
cbooth@edelson.com

  /s/ Natalie M. Limber
One of the Attorneys for
Avanquest North America Inc.

- 16 -